[Crim. No. 5422.   In Bank.   July 14, 1953.]

THE PEOPLE, Respondent, v. JOHN CHAUNCEY LAWRANCE, Appellant.

William W. Shaw for Appellant.

Edmund G. Brown, Attorney General, and Elizabeth Miller, Deputy Attorney General, for Respondent.

CARTER, J.—This is an automatic appeal (Pen. Code, § 1239) from a judgment of conviction of murder in the first degree and from an order denying a motion for a new trial.

The defendant, John Chauncey Lawrance, was tried by a jury, found guilty of murder of the first degree and was given the death sentence. The defendant was charged with having murdered one Kathryn Wells, also known as Kathryn Knodel, a human being, to which charge he pleaded not guilty and not guilty by reason of insanity. The plea of not guilty by reason of insanity was later withdrawn, and he went to trial on the single plea of not guilty. After having been found guilty by the jury of the crime, as charged, defendant moved for a new trial on all the statutory grounds (Pen. Code, § 1181), which motion was denied.

The victim, Kathryn Knodel, a girl 16 years of age, lived with her mother and stepfather in Redlands. The defendant, Kathryn's mother's brother, had been living two or three miles from the Knodel home, but had stated, about two or three weeks prior to the crime, which occurred on August 19, 1952, that he was driving to Tennessee for a visit. At the time he informed the family that he was going on the trip, he owned an old, dented, dirty-looking Dodge car which had very little paint remaining on it. He offered at that time to give it to Kathryn, but her mother had refused to let her have it. Mrs. Knodel and the defendant maintained a close family relationship and the defendant often visited the Knodel home. On August 19, 1952, Mr. Knodel left for work at 3:30 p.m.; at 5:45 p.m., Mrs. Knodel and the two younger children left for a swimming meet in San Bernardino. Kathryn was, at that time, watching television and was dressed in white twill shorts, a plaid shirt and had her hair tied in a pony tail with a piece of red ribbon. Mrs. Knodel told Kathryn that she would return home about 9:30 that evening. When she returned, a light was burning in the house, the television was turned off, the dishes had been washed and put away and Kathryn was not there. Mrs. Knodel thought she heard her daughter's laugh from the house next door and was not then disturbed about her absence. At midnight, Mrs. Knodel picked her husband up at his place of employment and they

returned to their home where they had something to eat and watched television for a while. At this time, the parents became alarmed at the girl's absence and started searching for her at the homes of some of her friends without success. After Mr. Knodel had gone to the police station and had returned home, they found a note in Kathryn's writing under Mrs. Knodel's purse on the dining room table. The note read "Mom, I will be right back, Kathryn."

Between 1 and 1:30 a.m. on August 20th, a Mr. Fred Lacy was driving from Indio to Palm Springs. Before he turned off Highway 99 on to Ramon Road, he noticed a bright light shining out toward the highway. When he turned on Ramon Road, he passed a car with very bright lights coming from the direction of Palm Springs. About 200 yards beyond the point where he had passed the car, he came upon a body lying across the white line of Ramon Road with the head to the north and the feet to the south. He did not stop but continued to Palm Springs where he reported the matter to the police department. The police proceeded to the spot described by the witness and found the body of a girl, identified as Kathryn Knodel, lying across the center line of the highway. The body was clad only in a brassiere and plaid blouse; it was lying on its back with the arms folded underneath. At that time, *rigor mortis* had begun to set in.

When the body was removed to the mortuary in Palm Springs, it was found to be bloody around the head and neck; the hair was thickly matted with blood and foreign matter. A tube was inserted in the vagina and specimens of the fluid found therein removed; this fluid was slightly reddish in color. When embalming was started about an hour later, it was found that there was very little force of blood within the veins. That afternoon, an autopsy was performed and it was determined that death had resulted from an injury to the head—a depressed fracture of the skull. On August 22d, another autopsy was performed upon the body. At this time, three groups of wounds were discovered: One group which had obviously occurred prior to death; another at about the time of death and another group which occurred after death. The differentiation as to time when the wounds were inflicted was possible because of the bleeding, or lack of bleeding about the wounds and the lack of tissue destruction due to bacteria. There were six wounds on the top of the girl's head, three of them of major significance. All of these

wounds had been made by a blunt object and were straight wounds, all had been produced prior to death and had hemorrhaged into the tissue and around the head. Some of the fragments of the fractured skull had pushed into the brain. It was the opinion of the pathologist that the wounds had been the result of well directed, rather intense blows. The face was badly cut and scratched; the entire left side of the nose was badly bruised and contused; there were two fractures of the lower jaw; there were teeth marks on the inside of the lips and several teeth were missing; there were fresh wounds in the gums. No hemorrhage was found in the vicinity of the jaw fractures or around the chin cuts, or around the left eyebrow, indicating that these wounds occurred at, or very near to the time of death. It was the opinion of the pathologist that the facial wounds had been made with a much broader object than the wounds on the scalp. The evidence showed that the wound on the right back side of the head was the most severe; that it was the only single wound which could have caused death and that the girl might have survived had she received medical attention. The balance of the body was scratched and bruised.

An examination of the external genitalia showed no signs of violence; the hymenal ring showed a tear 5/8 of an inch long and 3/16 of an inch deep, which extended into the vulva back of the hymenal ring. There was no evidence of hemorrhage in the area in or around the tear and no inflammatory cells such as would show a bacterial invasion. From this evidence, the pathologists determined that the tear occurred at, or near the time of death. The fluid extracted from the vagina was found to contain human spermatozoa.

With respect to defendant's activities on August 19th and thereafter, the evidence showed that on August 19th, at about 8:20 p.m., Olin and Samuel Blackwell left Redlands to drive to Beaumont. They drove out Highway 99 from Redlands and turned west on the Cherry Valley Road; at approximately 9:15, they saw on their left, a parked car, without lights, facing west. The car was a dirty, rusted and faded 1936 Dodge; a man was sitting on the front seat with his left arm on the steering wheel. When the Blackwell brothers returned from Beaumont, at about 10:45 p.m. the same night, the Dodge car was still parked where they had seen it earlier. They turned their car spotlight on it and saw that the back right-hand door of the car was open and that it extended over the shoulder of the road. They saw

some object lying on the bank close to the right side of the car; they saw no one in the car; they saw no flat tires on or off the car; they saw no tire jack. They did not stop, but continued on their way.

At about 11 or 11:30 p.m. that same night, a 1936 Dodge or Plymouth car, badly in need of paint, was seen at Garnet in Riverside County. It was stuck on the railroad tracks and a signal maintainer and a fireman jacked up the wheels of the car and put blocks under them. The defendant was present, but did not assist. When the wheels were up, the defendant got in the car and moved it backward off the tracks. Defendant turned the car lights off and drove it between the tracks and a siding to a spot in the vicinity of a faucet where he parked. Defendant then got out of the car and walked to the west; when a train came by, defendant got back in the car and sat there until the train had passed. He then got out of the car and opened the rear door. When next seen, he was closing the door after which he again walked to the west; he returned to the car which he drove back to the road, crossing the tracks in a northerly direction turning on the lights as he did so.

Defendant called his sister, Kathryn's mother, in Redlands about August 21st from San Francisco at about 11 o'clock at night. He testified that he had read about the girl's death in the papers; that his wife in San Rafael had told him the police were looking for him. Mrs. Knodel testified that she advised him to give himself up to the police. Defendant told the San Francisco police several different stories as to his whereabouts at the time of the crime. Later, he told the Redlands, Riverside and San Bernardino officers another story. He was taken from San Francisco to San Bernardino county and his car was taken by truck to a Riverside garage. His story was, finally, that he had stopped at his sister's home in Redlands at about 9:15 p.m. on August 19th; that Kathryn was there alone and that they had gone for a drive in his car for the purpose of having sexual intercourse which they had engaged in twice prior to the night in question. He stated that after they had parked, where the car was seen, they had intercourse; that she had then cleansed herself with a handkerchief and some water from a bottle in his car; that he noticed he had a flat tire on his right rear wheel and that he got out a jack with which to change the tire. He said that Kathryn was squatting on her heels just behind him and that the car rolled off the jack

and that the jack, or jack handle, slipped and hit her on the head. He said he noticed a car approaching and that he put her on the side of the road to get her out of sight but that she slipped over the bank; that he went after her but she was dead when he got to her; that he hit her with a rock a half dozen times to make it look like a hit-run accident; that he had taken off her panties and shorts and thrown them away. In another story, he told officers he had sexual relations twice with the girl—once before her death, and once thereafter in order to make it look like a rape case. He testified that after she had been hit with the jack handle, she fell and when he tried to lift her he found she had blood all over her; that he tried to stop the bleeding with a piece of inner tube around her head; that he didn't know where he got the tube; that as a car approached, he tried to get her out of sight; that she fell over the embankment and he fell, too; that he tried to get her back to the road but that she kept falling down causing him to fall also. He said that he left her in the gully, changed the tire, using a different jack, after blocking the front of the car with a rock he had found in the gully. He testified that when the tire was changed, he put the jack in the back of the car, threw the rock over the hill and went back after the girl whom he believed to be dead; that he did not have sexual relations with her then; that he did not deliberately hit her with any rocks; that it was then he decided to make it look like a case of rape so he removed her clothing. He said he finally succeeded in getting her up the hill and put her in the back of his car so he could move her to a place where she would be found. He picked up the rock which he had used to block the front of the car because he thought it might have blood on it; that he threw it into the back of the car where the girl lay and later took it out of his car and threw it into a field. He stated that later he got stuck on some railroad tracks; that he put on clean clothes which he had in the back seat of the car because the others had blood on them; that he felt a train was coming and took the body out of the car and dragged it about 30 feet from the tracks; that later he went back and got the body and put it back in the car. He said he washed off the blood on his hands and face at the water hydrant there and that he then drove to the spot where the body was later found. He said that he put the girl in the road and crossed her arms over her breast. He testified that he waited until he saw a car going toward Indio from what he thought

was the direction of Redlands; that it made a right turn on the road; that he then left and drove westward on Highway 99; that he stopped some place beyond the "vineyard area" and took everything out of the car and washed it out, tires, tools, and car; that he disposed of the jacks and tires in San Francisco before going to the police station. Four days after the body was found, a dark spot (identified as a blood spot) was found where the 1936 Dodge car had been seen parked; there were also stains on the road which could have been caused by water leaking from a car radiator parked with its front end toward the blood spot. There were what appeared to be drag marks from the dark spots down a 21-foot embankment at the side of the road; at the base of the bank were more blood spots and the dirt and debris at the base of a tree at the bottom of the embankment was heavily contaminated with human blood and with hair which matched that of the dead girl. The same kind of hair was found in the dark spot on the road. A 30-pound rock, found 3 miles from the bloodstain on the road, was found to be contaminated with human blood in a number of places and three eyebrow or eyelash hairs were also found there. It was the opinion of the pathologist that the facial wounds could have been caused by such a rock. Bloodstains and drag marks were also found at the Garnet railroad crossing where defendant had been seen getting in and out of his car as heretofore related.

■ Defendant's only contention is that the evidence is insufficient to support the judgment. It is contended that the first doctor who examined the body was unable to find any evidence that the girl had been criminally assaulted. Dr. Stephen's testimony is not susceptible of such an interpretation. His testimony showed that he was an internist, not a pathologist and that he was "working for the Coroner to determine what her cause of death was"; that he did an incomplete post-mortem examination; that he might, or might not, have bisected the uterus; that he made no examination of the vagina or of the hymenal ring; that he did nothing in his examination that could possibly have torn the hymenal ring; that he had taken a "wiping" from the very top of the vagina to see if it contained spermatozoa; that (in answer to the question of criminal assault) "I did not find anything in the examination, I would say it was so unsatisfactory, the examination, I would say because for a specimen being dried

out because I would put no emphasis on it one way or the other.'' Dr. Roos, the pathologist who later did a complete autopsy, testified that the uterus had not been previously opened; that he discovered no evidence of pregnancy or of menstruation. In this regard, it is contended that the reddish condition of the fluid withdrawn from the vagina indicates the presence of blood; that a reasonable inference to be drawn from this evidence is that the hymenal rupture was caused prior to death, or that it might have been caused when the fluid was withdrawn at the mortuary. It is also argued that the few spermatozoa found by Dr. Roos, the clean outer condition of the external genitalia, and the lack of evidence of external injury in that area, all lead to the conclusion that intercourse took place prior to death and was voluntary on the part of the deceased. The vaginal fluid withdrawn prior to either autopsy was found to contain human spermatozoa. Dr. Roos testified that he found one spermatozoon, portions of others and a pubic hair but that this was not surprising inasmuch as spermatozoa disintegrated rapidly in the presence of bacteria; that there was absolutely no hemorrhage in the hymenal tear, and no inflammatory cells; that he could reach ''no other conclusion'' than that the tear occurred at the time the girl died, or afterwards. He testified that the tear did not occur while she was living and with normal blood pressure because if it had there would have been evidence of bleeding into the surrounding tissue. He explained that a wound which occurred after death might ooze blood into the cut but not into the tissue around the wound; that the presence of blood in the vaginal fluid would have no significance so far as the time when the vaginal tear occurred. There is no merit to defendant's contention that the hymenal tear was caused by the mortician's assistant who inserted the tube to withdraw the fluid from the vagina. Dr. Roos testified that the insertion of a small, blunt tube could not cause the kind of tear found in the dead girl's body. It was within the jury's province to believe, as it did, the testimony of Dr. Roos and to infer, as it did, that the act of sexual intercourse caused the tear and that the act took place at the time of, or subsequent to, the death of the victim.

Defendant contends that Mr. Blackwell, when he visited the spot where he had seen defendant's car parked on the night of August 19th, had seen the blood spot and had said it was to the rear of the spot where he had seen the car parked on the night in question. This evidence, it is con-

tended, supports the defendant's story that the girl was accidentally struck by the jack, or jack handle, as he was changing the tire. Another fact relied upon by defendant is that the water spots on the highway contained rust, while that which leaked from the radiator of his car while in the Riverside garage was oily with only a small amount of rust. Defendant also makes much of the fact that the testimony of Mr. Pinker, the chemical expert of the Los Angeles Police Department, to the effect that there were no scratches on the underside of the right rear bumper, also showed that in making the test the carbon had not been removed therefrom. In this regard, it is contended that since defendant, after allegedly jacking up the right rear bumper, had driven to San Francisco, the underside of the bumper would be covered with carbon which would obliterate the jack marks. It is noted that the expert testified that there were scratch marks on the outside of the right rear bumper. Mr. Pinker testified that these outer scratch marks were such as might have been made by the bumper of another car striking the bumper of the car in question.

Defendant's contentions with respect to the testimony of the witness Blackwell that the blood spot was approximately 2 feet from the rear of the car as he remembered seeing it on the night in question, the content of the water spots on the highway as compared to the water content of that which leaked from his car, as well as the carbon-covered condition of the underside of the right rear bumper on his car, all appear to be without materiality in view of the evidence. The expert medical testimony was to the effect that the one single blow on the girl's head which could have, of itself, caused death, was the result of a "well directed, rather intense" blow. This statement, together with the fact that she was struck six blows upon the head, which the evidence showed were made by the same instrument, was sufficient evidence from which the jury could have inferred that the killing was not accidental. Except for the intentional, as distinguished from accidental, nature of the blows, the defendant's story and the evidence are corroborative one of the other.

The medical testimony is sufficient to support the jury's implied finding that the act of sexual intercourse took place at the time of, or after, the girl's death. Section 189 of the Penal Code provides that all murder which is committed in the perpetration of, or attempt to perpetrate, rape, is murder

of the first degree. The record here affords substantial support for the conclusion that the homicide was committed in the perpetration of, or attempt to perpetrate, rape (*People* v. *Lindley,* 26 Cal.2d 780 [161 P.2d 227]; *People* v. *Gutierrez,* 35 Cal.2d 721 [221 P.2d 22]).

Defendant makes veiled assertions that the testimony given by the forensic chemist and the pathologist was so positive and assured as to be unreliable. This contention is without merit. Defendant made no objection as to the admissibility of their opinions, and was, furthermore, given ample opportunity to cross-examine both witnesses.

A reading of the record in this case discloses that defendant's rights and interests were fully protected by his counsel and by the court and that he was accorded a fair and impartial trial in all respects.

The judgment and the order denying a new trial are, and each of them is, affirmed.

Gibson, C. J., Shenk, J., Traynor, J., Schauer, J., and Spence, J., concurred.