[Crim. No. 6382.   Second Dist., Div. One.   May 7, 1959.]

THE PEOPLE, Respondent, v. GRANT DEAN GUNN, Appellant.

Gladys Towles Root for Appellant.

Stanley Mosk, Attorney General, William E. James, Assistant Attorney General, and Carl Boronkay, Deputy Attorney General, for Respondent.

FOURT, J.—This is an appeal from a judgment wherein appellant was convicted of a violation of section 207, Penal Code (kidnapping).

In an information filed in Los Angeles County, the defendant was charged with the crime of kidnapping in that he did, on or about August 9, 1957, unlawfully, forcibly steal and take Louise Gunn in the county of Los Angeles, and carry said person into the county of Riverside. The defendant pleaded not guilty and by stipulation the case was submitted to the trial court upon the transcript of the proceedings had at the preliminary hearing, with each side reserving the right to offer additional evidence. Additional testimony was heard at the trial.

The defendant was found guilty. Sexual psychopathy proceedings were instituted and the defendant was found to be a probable sex psychopath and was committed to a hospital for a 90-day observation period. The hospital superintendent made a report to the court that defendant was not a sexual psychopath. Motions for a new trial and for probation were denied, and defendant was sentenced to the state prison.

The facts are substantially as follows: At about 8 :30 o'clock p.m., August 9, 1957, the complaining witness, Mrs. Margaret Louise Gunn was driving home from her work in her Pontiac automobile, and was in the vicinity of El Segundo Boulevard and Anzac Street when the defendant drove up in an automobile with their two children. Mrs. Gunn had secured an inter-

locutory decree of divorce from the defendant on July 17, 1957. One of the children called from the defendant's car, "My daddy wants you to stop. He wants to talk to you." The defendant got out of the car he was driving and came over to the car of Mrs. Gunn and stated in effect that he wanted to talk to her about the children. They then agreed that each of them should take one of the children. The defendant put the older child into the Pontiac automobile of Mrs. Gunn, and he, the boy, secured the keys to the Pontiac car and gave them to the defendant, who then unlocked the car and got in. Mrs. Gunn left the car, but was caught by the defendant and put back into the Pontiac automobile, and the defendant then drove away with the two children and Mrs. Gunn in her automobile.

At about 8:30 o'clock p.m., on August 9, 1957, Delbert E. Brossard and Robert E. Miller were driving in the vicinity of El Segundo and Anzac streets when they heard a woman screaming, and later calling for help. They turned a corner and saw a Pontiac automobile drive away from the side of the street at 45 to 55 miles per hour. They followed the automobile for about four or five blocks, but did not observe any disturbance inside of the car. Brossard wrote down the license plate number of the automobile on a slip of paper and turned it in to the police department authorities.

The defendant drove the car to Culver City, and then "out in the sticks" where he took Mrs. Gunn out of the car, to behind a fence, ripped off her clothes and committed an act of sexual intercourse upon her without her consent and against her resistance. He then bound her with his belt and gagged her with his shirt. The defendant then drove the automobile, with Mrs. Gunn and the two children in it, to a location on Culver Boulevard where his Studebaker car was parked on the street. During this time Mrs. Gunn was bound and gagged and her clothing consisted only of a "bra" and undergarments. She saw some people across the street, pushed off the gag and called for help. A man, who was a friend of the defendant, came to the car and was told by the defendant to pay no attention to Mrs. Gunn. The defendant then put the gag back in her mouth, placed her and the children in the Studebaker car and drove to Blythe, California, near the Arizona border. While enroute to Blythe, the gag and the belt were removed from Mrs. Gunn, but she was not permitted to have her clothing. When they stopped for gasoline the defendant put a blanket over the head of Mrs. Gunn and

clapped his hands over her mouth. They all slept in the car that night and arrived in Blythe the next day. From there they drove across the border. Mrs. Gunn did not say anything at the inspection station however, because the defendant had threatened to kill her if she did.

While in Arizona, the defendant and the children went swimming in the river. Mrs. Gunn was still without her clothing. Later the defendant took Mrs. Gunn to a trailer occupied by a woman friend of his and warned Mrs. Gunn not to say anything to the woman. The lady invited them in for coffee, and Mrs. Gunn announced that she did not have enough clothes on, and the woman put a towel around her. They spent two or three hours drinking coffee, and during that time Mrs. Gunn told the woman she was being held against her will.

Later Mrs. Gunn was given back her capri pants in which the zipper had been broken when the defendant had pulled them off of her. They drove into Blythe and Mrs. Gunn made a purchase of some new clothes in the presence of the defendant. The children, during this latter period of time, were left with the woman in the trailer. The defendant and Mrs. Gunn then drove out into the desert and had an act of sexual intercourse. They ate dinner at Blythe, and then drove back to Los Angeles. Mrs. Gunn and the two children were let out of the car at Sepulveda and Culver Boulevard. Mrs. Gunn went immediately to the office of the district attorney. The next day she went to work and that evening went to an emergency hospital.

For several months prior to the incidents heretofore related, Mrs. Gunn had lived away from the defendant. During that period he had threatened to kill her if she did not come back to him, and she was very much afraid of him. She stated further that from the moment he pulled her into the Pontiac car on August 9, and including the trip to Blythe and across into Arizona, and until she returned to Los Angeles and was released with the children on August 11, that she desired to be away from the defendant, and that she accompanied him against her will. She stated in effect that she was hindered from escaping because she was only clothed in underwear. She also stated that the defendant had twice beaten her while on the trip, first when he committed an act of intercourse with her, and secondly while on the way to Blythe. She was never outside of the presence of the defendant.

The appellant now contends that the evidence was insuffi-

cient to support the conviction in that the testimony of Mrs. Gunn was inherently improbable.

In reviewing the evidence in this case it is not appropriate that we attempt to substitute our judgment for that of the trial court. Our only function is to ascertain whether the evidence is sufficient to support the conviction. (*People* v. *Newland*, 15 Cal.2d 678, 681 [104 P.2d 778]; *People* v. *Tedesco*, 1 Cal.2d 211, 219 [34 P.2d 467]; *People* v. *Gardner*, 147 Cal.App.2d 530, 536-537 [305 P.2d 614]; *People* v. *Loehr*, 35 Cal.App.2d 1, 4-5 [94 P.2d 390].)

This case was heard by an experienced and skilled trial judge, who stated, in effect, at the conclusion of the trial that from the reading of the transcript of the preliminary hearing he was struck, in the first instance, with what appeared to be a fantastic story as related by Mrs. Gunn; but, that upon hearing the defendant and observing him in court, the defendant himself "added weight to the original story of the victim." The judge also stated in effect that much of the victim's story was corroborated by other evidence. The trial judge was satisfied as to the guilt of the defendant, the sufficiency of the evidence, and as to the fairness of the trial; otherwise he would have granted the motion for a new trial.

It is true, as said in *People* v. *Lewis*, 18 Cal.App. 359, at page 364 [123 P. 232]:

". . . Cases have occurred, . . . where the appellate court has felt itself constrained, in the interest of justice, to override the conclusions of jury and trial court, but such cases are rare, and occur only where the uncorroborated testimony of the complaining witness is so obviously and so inherently improbable as to leave the court no recourse, without self-stultification, except to reverse the judgment. But this obvious and inherent improbability must, however, very plainly appear before the reviewing court should assume the functions of the trial jury."

The courts of this state have set forth what must be found before it can be said that the evidence is inherently improbable. In *People* v. *Huston*, 21 Cal.2d 690, at page 693 [134 P.2d 758], the court said:

"Although an appellate court will not uphold a judgment or verdict based upon evidence inherently improbable, testimony which merely discloses unusual circumstances does not come within that category. (Citing case.) To warrant the rejection of the statements given by a witness who has been believed by a trial court, there must exist either a physical

impossibility that they are true, or their falsity must be apparent without resorting to inferences or deductions. (Citing cases.) ▮ Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. (Citing case.)'' (See also *People* v. *Gardner, supra,* 147 Cal.App.2d 530, 536-537; *People* v. *Carr,* 113 Cal.App.2d 783, 786 [248 P.2d 977]; *People* v. *Brown,* 100 Cal.App.2d 207, 209 [223 P.2d 60].)

▮ Also, in *People* v. *Braun,* 14 Cal.2d 1, at page 5 [92 P.2d 402], it was said: '' 'A statement, to bear upon its face the brand of improbability, or which may be said to be unbelievable, *per se,* must involve, we think, a claim that something has been done that it would not seem possible could be done under the circumstances described, or involve conduct that no one but a person of a seriously calentured mentality would be likely to do.' (*People* v. *Haydon,* 18 Cal.App. 543, 553 [123 P. 1102, 1104].)''

▮ We have heretofore set forth a résumé of the testimony, and we are of the opinion that the appellant is incorrect in his contention that the testimony is inherently improbable under the law. There is no doubt that the defendant, in forcing Mrs. Gunn back into her automobile and then driving as he did under the circumstances, committed an act of kidnapping. (See *People* v. *Gallagher,* 164 Cal.App.2d 414 [330 P.2d 464]; *People* v. *Nieto,* 14 Cal.App.2d 707 [58 P.2d 945]; *People* v. *Arechiga,* 72 Cal.App.2d 238 [164 P.2d 503]; *People* v. *Brazil,* 53 Cal.App.2d 596 [128 P.2d 204]; *People* v. *Harris,* 67 Cal.App.2d 307 [154 P.2d 442]; *People* v. *Valdez,* 3 Cal.App.2d 700 [40 P.2d 592]; *People* v. *Trawick,* 78 Cal. App.2d 604 [178 P.2d 45].)

The appellant seems to rely almost entirely upon the language in the case of *People* v. *Carvalho,* 112 Cal.App.2d 482 [246 P.2d 950]. However, a reading of that case will at once disclose that the factual situation in the instant case, and the facts in the cited case are different in many essential particulars.

We are not concerned with what motivated the conduct of Mrs. Gunn while in Blythe, after the defendant bought her some clothing. The kidnapping at that time had already occurred, and the fact that she adopted the course of conduct which she did, does not necessarily mean that the previous

occurrences as she stated them were inherently improbable. Unusual circumstances are not necessarily inherently improbable. (*People* v. *Huston*, 21 Cal.2d 690, 693 [134 P.2d 758]; *People* v. *Dragoo*, 121 Cal.App.2d 322, 324 [263 P.2d 90]; *People* v. *Becker*, 140 Cal.App. 162, 165-166 [35 P.2d 196]; *People* v. *Collier*, 111 Cal.App. 215, 226 [295 P. 898].)

The judgment is affirmed.

White, P. J., and Lillie, J., concurred.