[Crim. No. 5698. Third Dist. July 10, 1970.]

THE PEOPLE, Plaintiff and Respondent, v.
JOHN DANIEL MULQUEEN, Defendant and Appellant.

## COUNSEL

Robert N. Chargin, Public Defender and Charles T. Thompson, Deputy Public Defender, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, Edsel W. Haws and James D. Garbolino, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

MUNDT, J.* — Defendant herein appeals from a judgment of the superior court entered on a jury verdict finding him guilty of the crime of murder of the first degree, robbery of the first degree, and two prior felony

---

*Assigned by the Chairman of the Judicial Council.

convictions, namely, the second and third prior convictions charged in the information.

Defendant, in support of his appeal, contends, first, that the evidence was insufficient to support the verdict of either robbery of the first degree or murder of the first degree, that prejudicial error was committed in the assertion of the prior conviction before the jury, said prior conviction having been charged by the district attorney and denied by the defendant. Defendant also asserts there was error in the admission of the hotel receipt made out to him under a fictitious name which was found in the wallet of the deceased person, the alleged victim of the homicide.

### Facts

Because appellant's principal assertion is the insufficiency of the evidence, we present a complete statement of the evidence which resulted in the conviction.

This case came to the attention of the authorities the morning of July 4, 1969, when Ronald Carlstrom was found dead in the El Rancho Motel in Lodi, California; he had been shot in the back of the head with a single bullet. Two days later the defendant herein was arrested in Sparks, Nevada, for the murder of Carlstrom.

This story began in Hammond, Indiana, where Carlstrom operated as an independent trucker owning his own trucking rig. He usually worked alone, although on occasions he would undertake a long haul and would hire someone as codriver. On June 29, 1969, Carlstrom left Hammond for Sparks, Nevada, with a load of shampoo and rinses. The codriver was the defendant Mulqueen. The parties arrived in Sparks on July 2, 1969, at about 10 a.m. with their load. The truck was unloaded, and the load was found to be some 20 pieces short of the amount shown on the freight bill, a discrepancy which was hard to explain. It appeared the two men weren't too happy with each other because of this discrepancy.

While in Sparks, Carlstrom called a truck broker, seeking a load to transport east on his return trip. The broker directed him to pick up 504 crates of strawberries at Watsonville and 550 crates of lettuce at Salinas—this on July 3. They were to be delivered to Youngstown, Ohio, on July 7. Carlstrom requested an advance on his payment and the broker arranged for $400 to be picked up by him at the Western Union station in Salinas on the following morning. If Carlstrom had completed the trip he would have been paid approximately $1,400, less 10 percent brokerage and the advance. Later on that day Carlstrom arrived at the Vineyard Bar in Lodi, California, where he talked with the owner, Violet Copeland, and drank some beer,

mentioning to her that he was going to pick up some lettuce and strawberries on the following day. Carlstrom remained at the bar until 3 a.m., picking up a load of strawberries that afternoon, July 3, in Watsonville. He also picked up lettuce at Salinas. In the early evening of the same day he returned to the Vineyard Bar, parking nearby. Carlstrom indicated that he was very tired and had had no sleep since Monday. He identified himself as "Chester," but since Mrs. Copeland could not remember that name, he told her that she should call him "Don." Later on Carlstrom went out to his truck and came back with two pint-sized baskets of strawberries for Mrs. Copeland. He had bought beer and attempted to pay for it with a $20 bill. Mrs. Copeland, being short on change, asked if he had anything smaller. While he was getting a smaller bill from his wallet, she noticed that he had several bills in his wallet but did not identify the denominations thereof.

In the meantime the appellant had been in touch with a man named Martinez by phone. Martinez was on parole, living in Lodi approximately 10 blocks from the Vineyard Bar. Appellant told Martinez that he had a truck and was going to pick up some produce, asking Martinez whether he was interested in learning to drive a truck. Martinez said that he was still on parole and that he did not want to get involved. Appellant then told Martinez that there was a hitchhiker with him on the truck and that he was going to leave the hitchhiker off on the highway. Martinez declined to go with the appellant.

After the truck had been loaded with produce the appellant got in touch with Martinez again, asking him whether or not he wanted to ride with him and learn how to drive a truck. Martinez stated that he still had not changed his mind because he was still on parole.

After about 9 p.m. the appellant joined Carlstrom in the Vineyard Bar, this on July 3. He was introduced to Mrs. Copeland as "Benjamin." As Carlstrom and Mrs. Copeland were comparing ages, Carlstrom showed Mrs. Copeland his wallet containing his identification. During the course of the evening appellant left the bar, coming back several times, attempting to persuade Carlstrom to leave with him. Carlstrom indicated that he was having fun and didn't wish to leave. At about 1 a.m. on July 4 appellant came back to the bar and said, "I got us a room out here." Carlstrom asked him where and the appellant replied, "Right out here." Carlstrom still did not want to go and appellant left, saying, "I will be right back, I will go out and shave and be right back." Appellant came back to the bar shortly thereafter and he and Carlstrom left. Carlstrom told Mrs. Copeland that he would be back in 10 minutes and that she was not to close up and leave. Carlstrom promised her he would buy breakfast for her and three or more people in the bar. When Mrs. Copeland left the bar at 2 a.m., the truck belonging to

Carlstrom was still parked outside her bar. Between 1 a.m. and 2 a.m. on the morning of July 4, Carlstrom registered at the El Rancho Motel in Lodi under the name of "Chester Bass." He registered for one night, paid for the room, took the key and left. No one was with him at the time.

Approximately 2 a.m. that same morning, a janitor was cleaning the cafe adjacent to the motel. He heard a "bang." Had it not been for the fact that it was July 4, he would have thought that the noise was the report of a gun. However, since it was July 4, he thought that someone had set off a firecracker.

We next hear of the appellant when he drove into a service station in Sacramento sometimes between the hours of midnight and 5 a.m. on the morning of July 4. He purchased 25 gallons of diesel fuel for the tractor and 32 gallons of propane for the refrigeration unit.

At approximately 10 a.m. on the same day, a maid at the El Rancho Motel opened the door to room 26 and saw what appeared to be a body with blood on it on the floor. The maid closed the door and immediately notified the manager of the motel, who went to the room, recognized Carlstrom as the same person that registered about eight hours earlier. Carlstrom was dressed in the same clothes he wore when he registered. The police were called and an officer arrived at the motel about 11 a.m. and proceeded to the room, where he entered and examined the body. There were no signs of life, and upon lifting Carlstrom's arm to check the pulse he found it stiff, apparently from rigor mortis. A further examination revealed the entire body was in the same condition. There were two spots on the floor next to the body, one spot of blood and another of vomit. An examination of the room, which contained two beds, revealed that it did not appear to have been used to any extent whatever. On searching the clothing of the body, nothing was found. The deceased had no wallet, no keys, no watch, and no other personal possessions. The only indications that the room had been used were water spots on the bathroom mirror, a towel lying on the floor, and there was a broken sanitary seal removed from the toilet bowl. A police operator found a fingerprint of appellant Mulqueen on the inside of the door to room 26. During the autopsy of the body it was determined that Carlstrom had died almost instantly from a gunshot wound which penetrated the base of the skull from the rear. The bullet caused extensive brain damage as it moved toward the frontal area of the brain. Medical testimony established that the exact time of the death could not be determined in this particular case, but that an estimate would be from two to six hours prior to the discovery of the body at 10:45 a.m.

We now return to the appellant. Some 14 hours after the discovery of Carlstrom's body, appellant entered Bill and Effie's Truck Stop in Verdi,

Nevada, which is approximately five miles east of the Nevada-California border on Interstate 80. There appellant purchased a truck permit for temporary travel through Nevada, for which he paid $32, the permit being issued to Ronald C. Carlstrom, Hammond, Indiana, Mulqueen signing Carlstrom's name to the permit. Mulqueen also cashed a $100 Western Union money order payable to Carlstrom, signing Carlstrom's signature on the back of the money order. Later on the same morning appellant was seen unloading the truck into a station wagon belonging to a food market in Reno. Appellant inquired of a policeman if he could leave the truck on the parking lot of the grocery store and apparently was given permission since appellant and the driver of the station wagon left with the produce. On the same day appellant sold a crate of strawberries from the truck to Louie's Basque Corner in Reno and apparently left other crates at the hotel for sale on consignment. At 12:30 p.m. of the same day appellant drove to the Reno airport by taxi, where he rented a 1969 Mercury automobile, executing the rental agreement in the name of Mr. Carlstrom, giving as identification Carlstrom's A.T.&T. credit card, together with an Indiana temporary driver's license, presumably belonging to Carlstrom. Later and before dark appellant arrived with a load of produce at the storeroom door of John Ascuaga's Nugget in Sparks, Nevada, where he offered to sell the entire load of strawberries and lettuce to the storekeeper. However, the storekeeper bought only 40 crates of strawberries at $3 per crate. Appellant gave some strawberries to women who were passing by. Later, at about 5 or 5:30 p.m., we find appellant at Louie's Basque bar. After a brief time he left, returning at about 11 p.m., at which time he sold a crate of strawberries to the bartender for $3. He bought drinks for two couples in the bar and engaged in conversation with them. One of the couples was low on money and appellant offered them a loan of $100, which they declined. Appellant left the bar at 2 a.m., when it was closed.

Appellant was arrested by Reno and Sparks police officers in a bar in Sparks at 11 a.m. on July 6. He was searched and found not to be armed. He identified himself to the officers as Benjamin Weinstein. During the booking process at Reno appellant was searched and found to be carrying Carlstrom's driver's license and an A.T.&T. credit card. He had about $20 in cash. The truck was located in Reno and 82 crates of strawberries and three crates of lettuce were found to be missing from the original shipment from Salinas and Watsonvillle.

A truck driver, Edward Jacobsen, testified that Carlstrom was in the trucking business for some eight years and that he knew Carlstrom during that period. He testified early in the trial that Carlstrom was accustomed to carrying large sums of money with him, particularly on long trips.

The appellant in his own defense introduced evidence of another person tending to show that he was in the Bent Pretzel Bar in Lodi at approximately 1:50 a.m. on July the 4th and he also introduced testimony to show the time of travel by auto between the Bent Pretzel and the El Rancho Motel as being approximately four minutes.

On July 9, 1969, a key to room 26 was received in the mail by the owners of the El Rancho Motel. There was no indication as to where the key had been, who had sent it, or when it was sent.

The evidence is stated in a manner most favorable to the prevailing party as is required. It is on this basis that the court reviews the evidence. The factual presentation by the appellant consistently reviewed the record in the light most favorable to the appellant, a practice contrary to all rules of appellate procedure. (*People* v. *Gunn* (1959) 170 Cal.App.2d 234 [338 P.2d 592]; *People* v. *Newland* (1940) 15 Cal.2d 678 [104 P.2d 778].) The facts properly reviewed, that is, in the light most favorable to the respondent, indicate clearly that there is ample evidence from which a jury could find the appellant murdered Ronald Carlstrom in the perpetration of a robbery and in furtherance thereof. There is also ample evidence to show that the appellant deliberately and with premeditation shot and killed Carlstrom.

"The test on appeal is whether there is substantial evidence to support the conclusion of the trier of fact; it is not whether guilt is established beyond a reasonable doubt." (*People* v. *Redmond* (1969) 71 Cal.2d 745, 755 [79 Cal.Rptr. 529, 457 P.2d 321].)

If the circumstances of the crime reasonably justify the findings of the trier of fact, the reviewing court may not reverse the judgment because the facts might also be reconciled with a contrary finding. (*People* v. *Teale* (1969) 70 Cal.2d 497, 505 [75 Cal.Rptr. 172, 450 P.2d 564].) It is our function to determine whether there is substantial evidence, including inferences reasonably deduced from facts and evidence, to support the judgment of the trial court. Certainly here there is much more evidence than is necessary to support the judgment. (*People* v. *Bard* (1968) 70 Cal.2d 3, 6 [73 Cal.Rptr. 547, 447 P.2d 939].) Before a judgment may be reversed for insufficiency of the evidence, it must be made clearly to appear that upon no hypothesis whatever is there substantial evidence to support the conclusion reached in the court below. (*People* v. *Midkiff* (1968) 262 Cal.App.2d 734 [68 Cal.Rptr. 866].)

The degrees of murder are as follows: "All murder which is perpetrated by means of poison, or lying in wait, torture, or by any other kind of wilful,

deliberate, and premeditated killing, or which is committed in the perpetration or attempt to perpetrate arson, rape, robbery, burglary, mayhem, or any act punishable under Section 288, is murder of the first degree; and all other kinds of murders are of the second degree." (Pen. Code, § 189.)

■ All murder committed in the perpetration of a robbery is murder in the first degree, and this is true whether the killing is premeditated, deliberate and wilful or accidental and unintended and not planned as part of the commission of the robbery. (*People* v. *Mitchell* (1964) 61 Cal.2d 353 [38 Cal.Rptr. 726, 392 P.2d 526].)

■ Before one may establish first degree murder on the theory of felony murder, the prosecution must prove that the defendant harbored a specific intent to commit the crime of robbery or other felony. (*People* v. *Anderson* (1968) 70 Cal.2d 15, 34 [73 Cal.Rptr. 550, 447 P.2d 942].) ■ There was ample evidence here to establish that specific intent on the part of appellant.

Shortly prior to the day of the shooting, appellant contacted one Martinez twice, asking if Martinez wanted to learn how to drive a truck. Appellant told Martinez that he had a truck and that he was going to leave off a hitchhiker who was riding with him. Clearly this evidence shows that appellant intended to take Carlstrom's rig and that the hitchiker whom appellant was going to leave off was actually Carlstrom. The evidence also shows in this regard that appellant contacted Martinez a second time on July 3, 1969.

Thus appellant intended to assert ownership over Carlstrom's truck hours before he finally did so. There can be no doubt that appellant formed the requisite intent to rob Carlstrom of his truck and his personal possessions. Appellant depreciates the Martinez testimony, citing his reliance on the Fifth Amendment and the fact that he was on parole at the time he testified. He also asserted that it was evasive, failed to inspire confidence, and that it was lacking in reliability and credibility. While it is true that Martinez was a reluctant witness, it occurs to us that his reluctance was a result of one or both of two states of mind: one, that he had in fact participated with the defendant in events at Lodi, or two, that he did not desire to incriminate the appellant. His attitude would, it seems to us, lend credibility to his testimony rather than to depreciate credibility. In any event, the question of credibility was one for the jury.

The evidence is clear that the appellant did in fact rob the victim. On the night of the murder, appellant continually attempted to persuade Carlstrom to leave the bar. Finally appellant told Carlstrom that he had gotten a room in Lodi and at about 1:35 a.m. on July 4 the pair left the bar.

Shortly thereafter, Carlstrom checked into the El Rancho Motel by himself. He paid cash for the room and was given a key. He informed the motel owner that he was going to have a beer in the adjacent bar. The evidence is clearly established that Carlstrom was in possession of his wallet when he was in the Vineyard Bar and that the wallet contained bills of unknown denominations. At the time he rented his room he paid in cash from his wallet. When he was found dead the next morning, he was without possessions of any kind except the clothes on his body. He had no loose change, no wallet, no motel key, and no key to the rig. All items of identification had been removed from the body. The record shows also that Carlstrom had $400 the day before, given as an advance for his trip east.

We have already seen and it is undisputed that appellant was in possession of the wallet at a time subsequent to Carlstrom's death. The evidence is that appellant used the victim's identification to purchase the temporary permit in Nevada and to cash a $100 money order made out to Carlstrom. Appellant later used Carlstrom's identification to rent a car at Reno. Counsel for appellant urges that the possession of Carlstrom's wallet was evidence that appellant was holding the wallet for Carlstrom for the latter's use in business. There is no basis to support this contention.

It was noted in *People* v. *Yates* (1958) 165 Cal.App.2d 489, 493 [332 P.2d 314], quoting from *People* v. *Alexander* (1947) 78 Cal.App.2d 954, 956-957 [178 P.2d 813]: " 'While such possession would not, standing alone, suffice to determine the possessor's guilt, yet as evidence, its quality is of such high degree that only slight corroborative proof of other inculpatory circumstances would warrant a conviction.' "

■ "It is settled that when a person is shown to be in possession of recently stolen property slight corroborative evidence of other inculpatory circumstances which tend to show guilt supports the conviction of robbery." (*People* v. *Sorrentino* (1956) 146 Cal.App.2d 149, 160 [303 P.2d 859].)

■ The shot which was heard fired at the El Rancho Motel at about 2 a.m. on July 4 would be quite consistent with the theory that appellant accompanied Carlstrom to the motel, that Carlstrom registered alone, and that thereafter both went to room 26, where Carlstrom was robbed and murdered by appellant. It could not be determined from the autopsy with any degree of accuracy when the death actually occurred, but it was estimated by the surgeon to have been between 4:45 a.m. and 8:45 a.m. Actual variance in time of death could have been from two to 36 hours but it was not after 8:45 a.m. There were no signs of struggle in the room, which would indicate that Carlstrom was not killed during a fight or sudden quarrel. The room had hardly been used, supporting the theory that Carlstrom was killed very soon after entering the room. The victim was shot in the back of the

head, which would lend credence to a theory that the victim knew his killer, all of which points out that Carlstrom was the victim of a calculating, cold-blooded and dispassionate killer. The fingerprint places the appellant in the room on the morning the shot was fired.

The flight by the appellant is one of the factors which is relevant in concluding that he was conscious of his guilt. This consideration ". . . affords a basis for an inference of consciousness of guilt and constitutes an implied admission." (*People* v. *Brunk* (1968) 258 Cal.App.2d 453, 455 [65 Cal. Rptr. 727]; *People* v. *Jack* (1965) 233 Cal.App.2d 446 [43 Cal.Rptr. 566].) There is no question but that appellant was seen in the victim's truck in Sacramento at 5 a.m. on July the 4th and that the next day he was seen in both Reno and Sparks, all indicating that he had fled from the area where the crime had been committed.

Possession of Carlstrom's property, including his truck and its contents, his wallet and effects, and that appellant otherwise assumed the victim's identity for his own gain, clearly indicate his involvement in Carlstrom's death. The suggestion of counsel for appellant that the appellant's use of the victim's wallet and identification and equipment were incidental to his relationship of employer-employee with Carlstrom cannot find support. The load, of considerable value, was destined for Youngstown, Ohio, and should have been delivered in that city on or about July 7. Appellant was still in Reno, Nevada, on July 6, attempting to sell the strawberries and lettuce at various places and to various persons. He was not, obviously, engaging in his employer's business. Appellant knew, of course, that the crime would be discovered and that he would be suspect and that it would be dangerous for him to go to the city to which the goods were consigned. He hoped, obviously, to be able to sell the merchandise enroute and enjoy the profits derived from the sale.

We have thus far discussed the felony-murder doctrine. ▮ The jury could well have convicted the appellant of murder in the first degree on the basis that the killing was wilful, deliberate and premeditated. In *People* v. *Anderson, supra,* 70 Cal.2d 15, at pages 26-27, it was stated: "The type of evidence which this court has found sufficient to sustain a finding of premeditation and deliberation falls into three basic categories: (1) facts about how and what defendant did *prior* to the actual killing which show that the defendant was engaged in activity directed toward, and explicable as intended to result in, the killing—what may be characterized as 'planning' activity; (3) facts about the defendant's *prior* relationship and/or conduct with the victim from which the jury could reasonably infer a 'motive' to kill the victim, which inference of motive, together with facts of type (1) or (3), would in turn support an inference that the killing was the result of a 'pre-

existing reflection' and 'careful thought and weighing of considerations' rather than 'mere unconsidered or rash impulse hastily executed' [citation]; (3) facts about the nature of the killing from which the jury could infer that the *manner* of killing was so particular and exacting that the defendant must have intentionally killed acording to a 'preconceived design' to take his victim's life in a particular way for a 'reason' which the jury can reasonably infer from facts of type (1) or (2)." The evidence in the case at bar is plainly sufficient to establish murder in the first degree absent the felony-murder rule. There is evidence in this case falling into the category (1) of planning activity as set out in *Anderson, supra*. Appellant contacted Martinez twice in an effort to persuade Martinez to join him in the trucking operation. The evidence undeniably shows that appellant intended to hijack Carlstrom's truck and to kill him without leaving any trace as to his identity. There is further evidence of planning activity in appellant's insistence about getting his victim to leave the Vineyard Bar on the night of the killing. As a final measure, he indicated to Carlstrom that he had a motel and that they should proceed there. It could be reasonable that he was attempting to lure Carlstrom away from association with other people so that he could place his plan in effect. Time was running short. It is clear from all the facts stated that appellant had a clear and deliberate plan to take the life of Carlstrom and that such plan was carried into effect with exactitude.

██ To establish the crime of first degree murder, direct evidence of a deliberate, premeditated design to kill is not required. The necessary elements of deliberation and premeditation may be inferred from all the facts and circumstances as will furnish a reasonable basis for such inferences, and where the evidence is not in law insufficient, the matter is exclusively a question for the trier of fact to determine. (*People* v. *Cartier* (1960) 54 Cal.2d 300 [5 Cal.Rptr. 573, 353 P.2d 53]; *People* v. *Anderson, supra,* 70 Cal.2d 15; *People* v. *Saterfield* (1967) 65 Cal.2d 752 [56 Cal.Rptr. 338, 423 P.2d 266]; *People* v. *Lookadoo* (1967) 66 Cal.2d 307, 315 [57 Cal.Rptr. 608, 425 P.2d 208].) ██ Proof of circumstances occurring at the time of the killing, as well as circumstances before and after the killing, are competent to show deliberation and premeditation. (*People* v. *Sears* (1965) 62 Cal.2d 737 [44 Cal.Rptr. 330, 401 P.2d 938]; *People* v. *Tolbert* (1969) 70 Cal.2d 790 [76 Cal.Rptr. 445, 452 P.2d 661]; *People* v. *Morse* (1969) 70 Cal.2d 711 [76 Cal.Rptr. 391, 452 P.2d 607].) The manner and means employed to accomplish the killing are also important questions determining the degree of murder. (*People* v. *Guldbrandsen* (1950) 35 Cal.2d 514 [218 P.2d 977]; *People* v. *Lawrance* (1953) 41 Cal.2d 291 [259 P.2d 439].)

It is clear that the verdicts of first degree robbery and first degree murder are amply supported by the evidence. The jury here was fully instructed on the elements of each crime and they were instructed on alternate theories of

murder—felony murder, and deliberate and premeditated murder. There was ample evidence upon which the jury could sustain the verdict under either theory and there is sufficient substantial evidence to support the judgment as a matter of law. Appellant's contention that the evidence is insufficient cannot find support and must be rejected.

Appellant is concerned because of the filing by the district attorney of allegations of certain prior convictions. Of this the appellant's counsel says: "The right of the people to allege the commission of prior offenses as amendments to Indictment or Information is not questioned. The use of the right can be condemned." He suggests the filing of an amended indictment charging prior convictions was a last minute effort to encourage a plea of guilty to at least one of the counts. How that could have been effective in view of all the circumstances of this case is not apparent. Penal Code section 969 provides for filing of prior convictions and Penal Code section 969a provides for the procedure to be followed when a charge of a prior conviction is made. (See *People* v. *Finnegan* (1961) 192 Cal.App.2d 151 [13 Cal.Rptr. 264, 17 A.L.R.3d 1258]; *People* v. *Melgoza* (1960) 183 Cal.App.2d 600 [7 Cal.Rptr. 82].) The district attorney was acting within his rights in filing the allegation. There was no error. The fact that the offense for which the defendant was on trial was punishable by life or death does not change the rules.

When defendant was arraigned on the amended indictment, he denied the first, second and third felony prior convictions, admitting the fourth. Near the conclusion of the trial the prosecutor offered proof of the prior convictions previously denied in the form of certified copies of records from the various institutions. The proof was admitted as to the second and third prior convictions without objection and denied as to the fourth prior conviction on the legal grounds that the record did not show the defendant to have been represented by counsel before the entry of the plea or that he had been offered counsel. Counsel was of course relying on *Gideon* v. *Wainwright* (1963) 372 U.S. 335 [9 L.Ed.2d 799, 83 S.Ct. 792, 93 A.L.R.2d 733], and *People* v. *Coffey* (1967) 67 Cal.2d 204 [60 Cal.Rptr. 457, 430 P.2d 15]. Counsel stated, "This is a legal matter and should be taken up outside the presence of the jury." The evidence of the prior was ruled inadmissible and the jury was instructed to disregard it. It will be noted that defense counsel had notice of the allegation of the prior conviction preceding the trial and at the commencement thereof. He was at that time and at a time previous to the introduction of the evidence by the district attorney privileged to ask for a hearing outside the presence of the jury. He could and should have done so at the time of the arraignment on the prior convictions. He was aware of the state of the record and he knew whether or not there was a constitutionally invalid prior. He induced the

error by his own conduct and may not now complain. It is quite obvious that the district attorney acted in good faith at all times. Had defense counsel objected at any time, or had he requested a hearing outside the presence of the jury, the event would not have occurred. If prejudice resulted, such prejudice was invited. It seems clear from an examination of all of the facts of this case that if there was error, it was harmless beyond a reasonable doubt. Defendant was on trial for murder and robbery. The evidence was overwhelming in favor of prosecution. Three other prior convictions had been charged. They were admitted or proven and two of them came before the jury. They involved theft from interstate shipment in 1963 and issuing checks without sufficient funds in 1966. The prior conviction in controversy, the crime of breaking and entering, occurred in 1958. The jury was told by the court that the prior had not been established and was to be disregarded. Its insignificance in relation to the whole is so obvious that there is no possibility that the unfortunate reference thereto could conceivably influence the jury. ▮▮ We agree that it is error to admit a constitutionally invalid prior conviction in evidence either for impeachment purposes or to increase the penalty. (*People* v. *Coffey, supra,* 67 Cal.2d 204; *In re Dabney* (1969) 71 Cal.2d 1 [76 Cal.Rptr. 636, 452 P.2d 924].)

▮▮ In *Dabney,* at page 8, the court said: "Such error, however, may be found harmless under *Chapman.* [*Chapman* v. ·*California,* 386 U.S. 18 (17 L.Ed.2d 705, 87 S.Ct. 824, 24 A.L.R.3d 1065).] Accordingly, we adhere to our holding in *People* v. *Coffey, supra* [67 Cal.2d 204] that the introduction into evidence of an unconstitutional prior conviction is not prejudicial per se and therefore does not necessarily effect reversible error. Both the court's language in *Burgett* [*Burgett* v. *Texas,* 389 U.S. 109 (19 L.Ed.2d 319, 88 S.Ct. 258)] and the background provided by *Spencer* [*Spencer* v. *Texas,* 385 U.S. 554 (17 L.Ed.2d 606, 87 S.Ct. 648)] make clear, however, that only the most compelling showing can justify finding such error harmless beyond a reasonable doubt."

Such a showing has been made here and we find that the error, if there was error, was harmless to the extent required by *Chapman, supra.*

▮▮ Appellant makes the further point that it was error to introduce People's Exhibit No. 28, on the basis that the jury was not allowed to consider the writing on the back of the receipt. This exhibit was a hotel registration receipt made out to "J. Weinstein" on June 21, which was found in Carlstrom's wallet when it was taken from the appellant. It will be

recalled that "Weinstein" was the alias previously used by appellant. There was writing on the back of the receipt but this writing was not identified nor were the contents of the writing disclosed. Appellant objected to the introduction of the receipt into evidence on the basis that it was unfair to disregard the writing on the back. His theory was that should the writing on the back belong to Carlstrom, then the receipt would properly be found in the wallet. Because of the nature of the document in question, and its having been found in the possession of the appellant in the victim's wallet, it was relevant to show that appellant was in possession of the victim's wallet and that appellant used an alias on or about June 21. It seems to us, however, that this document had little probative value and that it was not harmful to the appellant. It is clear that the wallet belonging to Carlstrom was in the possession of defendant and that was established by other competent evidence. There was no error in relation to this ruling by the court.

■ The defendant was sentenced for the crime of murder in the first degree and robbery of the first degree, the sentences being ordered to run concurrently. The issue of the propriety of sentencing appellant on both charges has not been raised by either party, although the respondent in a footnote to his brief suggested that under the judgment pronounced, the term of imprisonment on the robbery conviction would merge and run concurrently with the life term on the murder conviction by reason of Penal Code section 669. This merger, suggested the respondent, would appear to eliminate the double punishment factor of Penal Code section 654. This is not the law. (See *In re Pratt* (1967) 66 Cal.2d 154 [56 Cal.Rptr. 895, 424 P.2d 335].) The sentence resulted in double punishment for one act for the reason that the act of robbery is the same act which made the homicide first degree murder. (See *People* v. *Magee* (1963) 217 Cal.App.2d 443, 470 [31 Cal.Rptr. 658].) It is held in the cases cited that a defendant may be charged with two offenses and convicted of both but that he cannot be punished for both and that it is proper to suspend the lesser of the two crimes, that is, the one punishable by the lesser term. It it is clear from the record here that there was but one act and that the act of robbery was the act which made the homicide first degree murder. The rule is stated in *People* v. *Chapman* (1968) 261 Cal.App.2d 149, 179 [67 Cal. Rptr. 601], as follows: "When a series of connected crimes is incident to one objective, the defendant may be punished for the most serious offense but not for more than one." (Pen. Code, § 654; *Neal* v. *State of Cailifornia* (1960) 55 Cal.2d 11 [9 Cal.Rptr. 607, 357 P.2d 839].)

For the reasons stated the sentence for robbery of first degree is suspended. The suspension shall remain effective for so long as the judgment

of the crime of murder in the first degree remains in full force and effect. (See *People* v. *Martinez* (1968) 264 Cal.App.2d 906 [70 Cal.Rptr. 918].)

The judgments are in all other respects affirmed.

Pierce, P. J., and Regan, J., concurred.