Filed 8/20/14  P. v. Baeza CA2/5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE, | B245457 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. VA111293) |
| v. | |
| NOE BAEZA et al., | |
| Defendants and Appellants. | |

APPEAL from judgments of the Superior Court of Los Angeles County, Dewey Lawes Falcone, Judge.  Noe Baeza's judgment is remanded in part for resentencing and is otherwise affirmed as modified.  Robert Benavidez's judgment is remanded in part for further proceedings and is otherwise affirmed as modified.

Cannon & Harris, Donna L. Harris, under appointment by the Court of Appeal, for Defendant and Appellant Noe Baeza.

Edward H. Schulman, under appointment by the Court of Appeal, for Defendant and Appellant Robert Benavidez.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Susan Sullivan Pithey, Supervising Deputy Attorney General, David Zarmi, Deputy Attorney General, for Plaintiff and Respondent.

## INTRODUCTION

Defendants and appellants Noe Baeza and Robert Benavidez were tried together before separate juries.[1] The respective juries found Baeza and Benavidez guilty of first degree murder (Pen. Code, § 187, subd. (a)[2]), kidnapping (§ 207, subd. (a)), first degree burglary (§ 459), and being a felon in possession of a firearm (former § 12021, subd. (a)(1), now § 29800, subd. (a)(1)). As to the murder, the juries found true the allegation that Baeza and Benavidez committed the murder while engaged in the crimes of burglary or kidnapping (§ 190.2, subd. (a)(17)); as to the murder and kidnapping, the juries found true the allegations that a principal personally used and intentionally discharged a firearm causing great bodily injury and death (§ 12022.53, subds. (b)-(d) & (e)(1)); and as to each of the offenses, the juries found true the allegations that the offenses were committed for the benefit of, at the direction of, or in association with a criminal street gang with the specific intent to promote, further, and assist in criminal conduct by gang members (§ 186.22, subds. (b)(1)(A)-(C)[3]) (gang enhancements). Benavidez admitted that he suffered four prior convictions—the information alleged the four prior convictions in support of the being a felon in possession of a firearm charge and as prior convictions within the meaning of section 667.5, subdivision (b). The trial court sentenced Baeza and Benavidez to state prison for life without the possibility of parole plus 55 years to life. Respondent argues that the trial court "neglected" to impose on Benavidez a mandatory

---

[1] Defendant Estevan Lepe also was tried before Baeza's jury. Lepe is not a party to this appeal.

[2] All statutory citations are to the Penal Code unless otherwise noted.

[3] Section 186.22, subdivision (b)(1)(C) as to the murder and kidnapping convictions, subdivision (b)(1)(B) as to the burglary conviction, and subdivision (b)(1)(A) as to the being a felon in possession of a firearm conviction.

consecutive 12 year term for his prior convictions under section 667.5, subdivisions (a) and (c).[4]

On appeal, Baeza contends that the trial court erred in denying his request to instruct his jury on the defense of necessity; insufficient evidence supports the special circumstance allegation that he committed the murder while engaged in the crimes of burglary or kidnapping; pursuant to section 654, the trial court should have stayed imposition of sentence on his kidnapping, first degree burglary, and being a felon in possession of a firearm offenses; and his abstract of judgment must be modified to strike the parole revocation restitution fine. Benavidez contends that the trial court erroneously instructed his jury on the burglary or kidnapping special circumstance; prejudicial material erroneously was not redacted from the transcript of his post-arrest recorded statement; insufficient evidence supports the gang enhancement; imposition of the section 12022.53, subdivision (d) 25 years to life enhancement for a defendant convicted of murder violates California's "'multiple conviction rule' based on included conduct" and federal double jeopardy principles; federal double jeopardy principles should apply to multiple punishments within a unitary trial and not to successive prosecutions only; pursuant to section 654, the trial court should have stayed imposition of sentence on his kidnapping offense; and the trial court erred in imposing a parole revocation restitution fine. Baeza joins Benavidez's arguments to the extent that they benefit him. Benavidez joins Baeza's argument that the imposition of a consecutive sentence on the kidnapping conviction violated section 654.

We order Baeza's abstract of judgment modified to reflect a stay of imposition of sentence under section 654 on his burglary and kidnapping convictions. We remand his case to the trial court for resentencing on his being a felon in possession of a firearm conviction. We order Benavidez's abstract of judgment modified to reflect a stay of imposition of sentence under section 654 on his burglary, kidnapping, and being a felon in possession of a firearm convictions and to strike the $1,000 parole revocation

---

[4] Benavidez's enhancements were charged under section 667.5, subdivision (b) and not section 667.5, subdivisions (a) and (c).

3

restitution fine.  We order Benavidez's case remanded for further proceedings, as set forth below, in connection with the prior conviction allegations under section 667.5, subdivision (b).  We otherwise affirm the judgments.

## BACKGROUND

### I.    Evidence Presented to Both Juries

Arturo Alvarez was a member of the 38th Street gang.  Alvarez, his wife Erica Castro, their two children, and Alvarez's parents lived in a house on Kauffman Avenue in South Gate.

About 12:30 or 12:50 a.m. on July 7, 2009, Alvarez, Castro, and their children were asleep in the living room.  Alvarez's parents were asleep in a bedroom.  Alvarez, Castro, and their children were awakened by banging outside the front door.  Someone said, "FBI.  Open the door."  Alvarez, Castro, their children, and Alvarez's mother went to one of the bedrooms.

Castro heard two gunshots.  Two men dressed in black and wearing masks entered the bedroom.  The men were armed with "long," "rifle-type" weapons.  One or both of the men issued an order to "[g]et on the floor."  A third man entered the room.  One of the men told Alvarez's mother that her son was a "fugitive of the law."  One of the men picked up Alvarez from the floor.  Alvarez's hands were secured behind his back and the men took Alvarez out of the bedroom.  As they were leaving, one of the men said into a radio or phone, "We got suspect."

About five seconds later, Castro left the bedroom to determine what was happening.  She did not see anything in the living room, and went out the front door.  She did not see Alvarez.  The police arrived within seconds.

Rudy Dominguez lived on Kauffman Avenue about a third of a block from Michigan Avenue.  About 12:50 a.m., on July 7, 2009, Dominguez was awakened by a banging noise.  He heard two gunshots and went outside.  He looked in the direction of Michigan Avenue and saw a man run from the house on the corner of Michigan and Kauffman Avenues and get into a tan van.  The man drove the van to the corner and

4

parked on Michigan Avenue. He then ran back into the house on the corner. Three persons ran out of the house and got into the van. The van drove on Michigan Avenue toward Atlantic Avenue and the 710 Freeway.

About 12:50 a.m. on July 7, 2009, South Gate Police Department Officer Robert Pellerin was in his police car near the intersection of Atlantic and Michigan Avenues when he received a call of shots fired on Kauffman Avenue. The call included a description of a tan van. Immediately after receiving the call, Officer Pellerin saw a van that matched the vehicle described in the call. Officer Pellerin followed the van onto the 710 Freeway. He pulled up next to the van and shined his spotlight through the driver's window. Lepe was driving the van. The van transitioned onto other freeways before exiting on Rosecrans Boulevard. At some point, the van reached the intersection of Broadway and 124 Street where it slowed and a man jumped out and ran.

Officer Pellerin activated his emergency lights and siren, but the van did not stop. Instead, the van accelerated. The van slowed again when it reached the intersection of Spring and 123rd Streets. A second man jumped out of the van. Los Angeles County Sheriff's Department Deputy Darell Edwards responded to a report that a kidnapping suspect had fled from a vehicle and had run to an area on 121st Street between Bremerton and Spring Streets. A Sheriff's Department's airship advised Deputy Edwards and other responding deputies that the suspect was hiding behind the porch of a residence on West 121st Street. There, Deputy Edwards took the suspect, whom he identified as Benavidez, into custody.

When the van reached the intersection of 55th Street and Figueroa, the van slowed and Baeza jumped out. Baeza surrendered to California Highway Patrol Officer Eric Beltran and his partner.

At the intersection of Hoover and 55th Streets, a California Highway Patrol unit employed a "pursuit-ending" measure called a "pit maneuver" to stop the van. The van's driver got out and ran. He entered the back door of a house on 55th Street. Sheriff's Department deputies ordered out the occupants of the house. Lepe and other persons, who appeared to be members of his family, came out of the house.

5

Sheriff's Department Deputy Louie Aguilera assisted in the investigation of Alvarez's kidnapping and murder. He found Alvarez in the back of the van. There was duct tape wrapped around Alvarez's face and head. His hands and feet were bound with Ziploc flex cuffs. Blood spatter on the inside of the rear hatch indicated that Alvarez had been killed inside the van. Deputy Aguilera found in the van a 9 millimeter shell casing; various firearms, including four handguns, one shotgun, and one rifle; and ammunition. He also found in the van five flak vests, gloves, and two ski masks. Sheriff's Department deputies examined Alvarez's house. On the front porch, they found two 12 gauge shotgun shell casings.

Deputy Medical Examiner Dr. Kevin Young performed the autopsy on Alvarez's body. He testified that Alvarez suffered two gunshot wounds to his head. Each wound was fatal. He recovered a "projectile" from Alvarez's body associated with each gunshot wound.

Sheriff's Department Deputy Dale Falicon testified for the prosecution as a firearms expert. Deputy Falicon testified that a Smith and Wesson handgun found in the van fired the 9 millimeter shell casing found in the van. That handgun also fired the bullets that the coroner recovered from Alvarez's body. Sheriff's Department Criminalist April Wong, also a prosecution firearms expert, testified that the two shotgun shells found outside Alvarez's house were fired from a shotgun found inside the van.

Sheriff's Department Criminalist Juli Watkins obtained a DNA profile from one of the ski masks found in the van. That profile matched a DNA profile from Baeza. A DNA profile from the grip on the Smith and Wesson handgun that fired the shell found in the van and the bullets recovered from Alvarez's body was a mixture of contributors. Watkins was able to exclude Lepe and Baeza as possible contributors. She could neither include nor exclude Benavidez as a contributor. Benavidez was a possible contributor to a DNA profile from a second Smith and Wesson handgun.

6

## II.     Evidence Presented Only to Benavidez's Jury

About 11:25 a.m. on July 7, 2009, Sheriff's Department Detective Wayne Holston and his partner, Sergeant Steve Rubino, interviewed Benavidez. A recording of the interview was played for the jury at trial. Benavidez's jury was provided a transcript of the interview to read while they listened to the recording.

In the interview, Benavidez said he used to "run with" "213 Maywood," and was known as "Big Rob."[5] He was not then "with" 213 Maywood because he had children. His parole agent's name was "Jones."

Benavidez said that he was walking down the street about 11:00 p.m. or midnight when a van pulled up and a man inside asked if he wanted to "get some money." The man said that he and others were going to "go into a house." Although reluctant at first, Benavidez got into the van. Inside were five or six men dressed in masks. There were guns in the van.

As they were driving, the men told Benavidez that there was "fifty thousand" in the house that they would split. When they arrived at their destination, Benavidez, the driver, and another man waited at the van while three men went to the house. Benavidez heard banging on the door and two gunshots. The men broke down the door. Benavidez wanted to run, but was afraid that he might be shot. Six or seven minutes later, the three men returned with another man who was handcuffed with his hands behind his back.

At some point, the driver said that the police were following them. After one of the men jumped out of the van, Benavidez also jumped out. He ran and hid on a porch where the police found him. Benavidez said that "they" did not shoot or stab Alvarez while Benavidez was in the van. Benavidez denied killing anyone.

Benavidez then admitted that he had been lying. He said that there were four other men in the van and that he and the driver waited outside while the others entered the house. His role was to watch out for the others. Benavidez denied that he knew any of

---

**5**     The recitation of Benavidez's statement to Detective Holston and Sergeant Rubino is taken from the transcript provided to the jury.

the men in the van. He denied that he touched any of the guns. Benavidez opened the door for the men when they returned to the van.

Sergeant Rubino expressed doubt that Benavidez just happened to be walking along when a van pulled up and its occupants asked Benavidez if he wanted to make some money. Detective Holston asked Benavidez if he had any phone conversations with the other men. Benavidez said the men gave him a "chirp" device which he somehow called with his own phone. The men took back the chirp.

Sergeant Rubino suggested that other suspects were in custody and would "talk" and said that Benavidez needed to tell him what happened. Benavidez said he would tell the truth. He said that about a week earlier, he saw a 38th Street gang member named "Grumps" at a swap meet. He had been in "Chino" with Grumps before Grumps was paroled. Grumps told Benavidez that he had some work for him. Benavidez understood the work to be robbing Grumps's "homeboy"—"they said it was money, not a guy." Benavidez was told that they would split "50 G's." Grumps gave Benavidez a phone number to call. About 10:00 p.m., "they" called Benavidez and asked him if he was ready. "They" picked him up near an El Pollo Loco restaurant. Benavidez said that when he entered the van, "they" gave him gloves. "They" also gave him a handgun which he "grabbed" with his gloves.

At the house, Benavidez was given a sledgehammer which he used to strike the door, but he could not open it. He said to his companions, "Let's jam, let's jam, fuck that, let's jam." One of the men shot the door, and Benavidez's two companions went inside. Benavidez did not want to join them but did. Benavidez walked out when he encountered two ladies and children. He also said he walked out when the other two men brought out "the guy." Benavidez denied that the two other men shot the kidnap victim while Benavidez was in the van. Benavidez said that the person who had been kidnapped did not say anything in the van when Benavidez was in it.

8

**III.	Gang Evidence**

*A.	Evidence Presented to Both Juries*

Baeza was housed in the discipline module at the Twin Towers Correctional Facility. Sheriff's Department Custody Assistant Art Valenzuela worked at the Twin Towers. Valenzuela performed a contraband search of personal property Baeza was allowed to possess in jail and confiscated as contraband four pieces of paper that he believed were gang-related.

Apparently testifying about one of the pieces of paper confiscated from Baeza, Custody Assistant Valenzuela testified that the paper was a "roll call." A roll call was a piece of paper typically passed around by Hispanic gang members. Among other things, a gang member wrote his name and the gang to which he belonged on the roll call. Baeza's name was on the roll call, and he was identified as a member of the Southside 38th Street gang with the moniker "PWee." If a person signed his name to the roll call falsely identifying himself as a gang member there would be consequences.

*B.	Evidence Presented Only to Baeza's Jury*

Los Angeles Police Department Officer Bryan Schilling testified as a gang expert for the prosecution. He opined that Baeza was a member of the 38th Street gang. Baeza's monikers were "PWee" and "Magoo."

The prosecutor presented Officer Schilling with a set of hypothetical facts based on the facts in this case. Officer Schilling opined that the burglary, kidnapping, and shooting reflected in those hypothetical facts were committed for the benefit of the 38th Street gang. Because one 38th Street gang member was involved in crimes against another 38th Street gang member, Officer Schilling inferred that the victim had to have done something that was a severe violation of a gang rule. Before one 38th Street gang member could kill another 38th Street gang member, he would have to receive approval from the "higher-ups" who ran the gang. The crimes could benefit the gang in a number of ways. The crimes could be an "in-house cleaning" of a snitch or a member who had stolen money or narcotics (presumably from the gang). By "tak[ing] out one of their

9

own," the gang would show other gang members that there were serious repercussions for crossing the gang.

### C.    *Evidence Presented Only to Benavidez's Jury*

Montebello Police Officer Omar Rodriguez testified as a gang expert for the prosecution. In Officer Rodriguez's opinion, Benavidez was a member of the 213 gang. The prosecutor presented Officer Rodriguez with a set of hypothetical facts based on the facts in this case. Officer Rodriguez opined that the burglary, kidnapping, and shooting described in the hypothetical facts benefited the 213 gang. Such crimes have a significant effect on a community—gangs operate based on fear and intimidation. If the community is intimidated by and fearful of a gang, it is less likely to cooperate with the police when the gang commits crimes, thus allowing the gang to commit crimes openly.

## IV.    Defense Case

Baeza testified in his own behalf before his and Benavidez's juries. Baeza testified that Alvarez, a 38th Street gang member, was his childhood friend or acquaintance. Alvarez had a reputation for being very violent.

On July 7, 2009, "Memo," a 38th Street gang member and Baeza's childhood friend, contacted Baeza at his home in Corona. Memo informed Baeza of a "very serious situation" that involved several other 38th Street gang members. Memo told Baeza that he had participated in Daniel Villasenor's kidnapping, and asked Baeza to undertake a "mission" to kidnap Alvarez to gather information about where Villasenor was being held in "T.J." Villasenor had been kidnapped at the beginning of July and a warning had been given "that there was less than 24 hours before he was going to start being shipped in pieces to the family." Baeza believed that Alvarez was responsible for Villasenor's kidnapping.

Baeza knew who Villasenor was, but had never spoken with him. He last spoke with Villasenor's father in the late 1990's. Baeza had friends in law enforcement. He thought about calling law enforcement to inform them that Alvarez had information about

10

Villasenor's kidnapping, but did not call. Instead, he undertook the "mission" to kidnap Alvarez.

A plan was devised to kidnap Alvarez from his house and take him to Mexico where he would be turned over to the Mexican military so they could interrogate him and learn where Villasenor was being held. The Mexican military was to recover Villasenor, and Baeza was to return him to his family. Baeza had connections to the Mexican military through his military background in the United States Army and his combat service in Bosnia and Iraq. Baeza's "mission" was to obtain information from Alvarez about Villasenor's whereabouts. The plan did not include killing Alvarez.

Baeza met Memo at Ross Snyder Park. Other people "showed up"—between two and 10 others. Baeza brought an M-16, a high-capacity magazine, and a ski mask. Memo provided Baeza with a flak jacket.

Baeza and others gained entry to Alvarez's house. Baeza knew he was breaking the law when he entered Alvarez's house. Alvarez was removed from the house and placed in the van. His hands and feet were bound. Benavidez was present in the van after Alvarez had been taken. Baeza removed his mask to try to reassure Alvarez that there was "a way out of this." Baeza wanted Alvarez to know that Baeza was there and that what was taking place concerned Villasenor, and they were not "trying to do anything against his family."

Baeza and another man questioned Alvarez about Villasenor's whereabouts. Alvarez was told that he would be let go if he provided Villasenor's location. When the van entered the 710 Freeway, a police car began to follow it. Once Alvarez was aware that a police car was behind the van, he threatened to kill Villasenor and everyone in the van and their families. Baeza believed Alvarez when he said that he would kill Villasenor, Baeza, and Baeza's family.

Alvarez did not stop making threats, so someone put duct tape around his mouth. After Alvarez's mouth was taped, someone shot Alvarez. Baeza did not shoot Alvarez. He did not know who shot Alvarez because the others in the van were still wearing ski masks. There was no discussion about shooting Alvarez and nothing was said before

11

Alvarez was shot. Whoever shot Alvarez took it upon himself to do so. Baeza disagreed with Alvarez's killing because a dead person cannot provide information. If he had wanted Alvarez dead, he could have shot him from a distance of 600 meters.

After Alvarez was shot, people started leaving the van one at a time. Baeza also left the van. When he got out, he raised his hands to surrender. After his arrest, Baeza was placed in a cell with Benavidez. Benavidez asked Baeza, "Who killed that fool?"

Baeza denied that he was a member of the 38th Street gang, but admitted that he was an "associate" of the gang. He claimed to be a member of the 38th Street gang in jail for security reasons. No one told Baeza that "this was done in order to clean up 38th Street." Baeza believed that there would be repercussions from 38th Street "over this," but that did not stop him. The "mission" was not a gang operation—i.e., something to benefit the 38th Street gang, but something personal that dealt with someone who had been kidnapped.

Baeza was not paid for his participation in the "mission," nor was he threatened to coerce his participation. Baeza took on the "mission," even though he did not know the Villasenor family well because he had performed such missions overseas on other occasions and he knew that innocent lives unrelated to gang life were at stake. Villasenor was in imminent danger. Baeza explained that even though the "mission" involved significant risk and that he would be breaking the law and facing punishment, he "felt that deep down inside [his] conscience, this was the better option of the whole situation of what was put on [his] plate." He did not contact law enforcement because "given that there was border lines to cross, law enforcement would not go and arrest Mr. Alvarez just on hearsay." Memo had come to him with solid information.

On cross-examination, Benavidez's attorney asked Baeza about his concern for innocent family members. He asked Baeza if Alvarez had made threats against Baeza's innocent family members. Baeza responded, "Correct." Benavidez's attorney asked if, "certain things" had to be done to take care of that threat to his family. Baeza responded, "Correct." The trial court asked Baeza, "Well, what certain things had to be done to

12

protect his family." Baeza responded, "Well, I don't know which spectrum he is talking about."

The trial court then asked Baeza a series of questions eliciting the following summary of Baeza's "mission:" The plan on July 7, 2009, was to kidnap Alvarez to obtain information from him about Villasenor's location. If Villasenor could not be located, Alvarez would be exchanged for Villasenor's release. If neither of those options was successful, Baeza would take Alvarez to Mexico and turn him over to the Mexican military.

Baeza's attorney introduced a certified copy of a complaint and a second amended information charging Salvador Adame Martinez, Jr. with "Daniel V.'s" July 1, 2009, kidnapping. The parties stipulated that Villasenor was alive and that Martinez had been convicted of kidnapping Villasenor.

## DISCUSSION

### I. Necessity Instruction (CALJIC No. 4.43)

Baeza contends that the trial court erred when it denied his request that his jury be instructed on the defense of necessity with CALJIC No. 4.43[6] as to the kidnapping charge. The trial court did not err.

---

[6] CALJIC No. 4.43 provides:
"A person is not guilty of a crime when [he] [she] engages in an act, otherwise criminal, through necessity. The defendant has the burden of proving by a preponderance of the evidence all of the facts necessary to establish the elements of this defense, namely:
"1. The act charged as criminal was done to prevent a significant and imminent evil, namely, [a threat of bodily harm to oneself or another person] [or] [ ];
"2. There was no reasonable legal alternative to the commission of the act;
"3. The reasonably foreseeable harm likely to be caused by the act was not disproportionate to the harm avoided;
"4. The defendant entertained a good-faith belief that [his] [her] act was necessary to prevent the greater harm;
"5. That belief was objectively reasonable under all the circumstances; [and]
"6. The defendant did not substantially contribute to the creation of the emergency[.] [; and

13

*A.    Background*

Baeza's attorney requested that the trial court instruct his jury with CALJIC No. 4.43. The trial court cited *People v. Miceli* (2002) 104 Cal.App.4th 256, 268 for the proposition that a necessity instruction is not appropriate when the defendant made no attempt to enlist the aid of law enforcement. The trial court stated that Baeza testified that he had friends in law enforcement but made no effort to seek their assistance. The trial court stated that Baeza's attorney could review *People v. Miceli* and that it would consider the request again.

When later discussing jury instructions, the trial court stated that it had reviewed CALJIC No. 4.43 and it remained the court's position that there was not substantial evidence to instruct the jury on necessity. Baeza's attorney argued that in *People v. Miceli, supra,* 104 Cal.App.4th 256, the issue was whether the defendant's belief that his crime was necessary to prevent a greater harm was objectively reasonable. Such an inquiry, counsel argued, was for the jury. He further argued that the danger to Villasenor was real and not speculative—Baeza testified that he had been informed that those who held Villasenor would start sending him home in pieces in 24 hours.

Baeza's attorney also argued that although the FBI was working on Villasenor's kidnapping, due to the "time constraints" time was of the essence. Baeza did not contact local law enforcement because complaints to such entities are not acted upon quickly. Moreover, Baeza did not have information that would establish probable cause for a search warrant or an arrest warrant for Alvarez.

The prosecutor argued that there was a reasonable legal alternative to kidnapping Alvarez—Baeza could have contacted law enforcement. He also argued that the Baeza's belief that kidnapping was necessary to prevent greater harm to Villasenor was not objectively reasonable because there was no showing that imminent bodily injury to Villasenor could have been avoided even if Alvarez had divulged Villasenor's location.

---

"7. The defendant reported to the proper authorities immediately after attaining a position of safety from the peril.]"

In addition, Baeza did not call law enforcement and inform them that Alvarez was involved in Villasenor's kidnapping.

The trial court declined to instruct Baeza's jury with CALJIC No. 4.43. It based its ruling on Baeza's failure to contact law enforcement

### B. Application of Relevant Principles

"A defendant is entitled to instruction on request on any defense for which substantial evidence exists. [Citation.] However, the trial court need give a requested instruction concerning a defense only if there is substantial evidence to support the defense. [Citation.] A defendant raising the defense of necessity has the burden of proving that he violated the law '(1) to prevent a significant evil, (2) with no adequate alternative, (3) without creating a greater danger than the one avoided, (4) with a good faith belief in the necessity, (5) with such belief being objectively reasonable, and (6) under circumstances in which he did not substantially contribute to the emergency.' [Citation.]" (*People v. Miceli, supra,* 104 Cal.App.4th at p. 267.)

When a defendant shows that he had a good faith belief in the need to break the law to prevent a significant and imminent harm, that belief must be objectively reasonable. (*People v. Miceli, supra,* 104 Cal.App.4th at p. 268.) "As a matter of public policy, self-help by lawbreaking and violence cannot be countenanced where the alleged danger is merely speculative and the lawbreaker has made no attempt to enlist law enforcement on his side. '[T]he defense of necessity is inappropriate where it would encourage rather than deter violence. Violence justified in the name of preempting some future, necessarily speculative threat to life is the greater, not the lesser evil.' [Citation.]" (*Ibid.*)

The trial court properly declined to instruct Baeza's jury on necessity with CALJIC No. 4.43 because substantial evidence did not support the instruction. Baeza failed to show that he did not have an adequate alternative to breaking the law. (*People v. Miceli, supra,* 104 Cal.App.4th at p. 267.) "The normal and appropriate response to a perceived criminal emergency is to call the police." (*Ibid.*) Baeza did not show that

contacting law enforcement was not an adequate alternative. Baeza did not contact law enforcement to inform them that Alvarez was involved in Villasenor's kidnapping even though he believed that the FBI was investigating Villasenor's kidnapping. "The failure to report an emergency to the proper authorities does not bar a necessity defense if the evidence shows 'a history of futile complaints which makes any result from such complaints illusory.' [Citation.]" (*Id.* at p. 268.) Baeza made no such showing.

Baeza also failed to show that his belief in the need to break the law to prevent an imminent and significant harm was objectively reasonable. (*People v. Miceli, supra,* 104 Cal.App.4th at p. 268.) Even though he believed that the FBI had an ongoing investigation of Villasenor's kidnapping, Baeza did not contact the FBI with information pertinent to that investigation. Instead, at the urging of a 38th Street gang member, Baeza participated in the home invasion kidnapping of a gang member he believed to be "very violent" in an effort to obtain information about Villasenor's whereabouts. He participated in that home invasion kidnapping with four other persons he did not know. In the process of the home invasion kidnapping, which began with two shotgun blasts to gain entry into the Alvarez home, Baeza and his companions endangered Alvarez's life, and the lives of Alvarez's wife, children, and parents. Under the circumstances, Baeza's action was objectively unreasonable. Accordingly, there was not sufficient evidence to require an instruction on necessity as a defense.

## II. Sufficiency of the Evidence Supporting the Special Circumstance Finding that Baeza Committed Alvarez's Murder While Engaged in the Crimes of Burglary or Kidnapping

Baeza claims that insufficient evidence supports the special circumstance finding that he committed Alvarez's murder while engaged in the crimes of burglary or kidnapping. He contends that the evidence was insufficient to support a finding that he aided and abetted the shooter in Alvarez's murder with the intent to kill or that he acted with reckless indifference to human life by participating in the burglary or the kidnapping. Because the evidence was sufficient to support the finding that Baeza aided

16

and abetted the burglary and kidnapping as a major participant with reckless indifference to human life, sufficient evidence supports the special circumstance finding.[7]

### A. Standard of Review

"'When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' (*People v. Lindberg* (2008) 45 Cal.4th 1, 27 [82 Cal.Rptr.3d 323, 190 P.3d 664].) We determine 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' (*Jackson v. Virginia* (1979) 443 U.S. 307, 319 [61 L.Ed.2d 560, 99 S.Ct. 2781].) In so doing, a reviewing court 'presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' (*People v. Kraft* (2000) 23 Cal.4th 978, 1053 [99 Cal.Rptr.2d 1, 5 P.3d 68].) The same standard of review applies to the sufficiency of the evidence supporting special circumstance findings. (*People v. Chatman* (2006) 38 Cal.4th 344, 389 [42 Cal.Rptr.3d 621, 133 P.3d 534] . . . .)" (*People v. Edwards* (2013) 57 Cal.4th 658, 715.)

### B. Application of Relevant Principles

Under section 190.2, subdivision (d),[8] a jury may find true the special circumstance of murder in the commission of a burglary or kidnapping when the

---

**7** Because we hold that there was sufficient evidence that Baeza aided and abetted the burglary and kidnapping as a major participant with reckless indifference to human life (§ 190.2, subd. (d)), we need not decide whether there also was sufficient evidence that he aided and abetted Alvarez's first degree murder with the intent to kill (§ 190.2, subd. (c)).

**8** Section 190.2, subdivision (d) provides:

17

defendant was not the actual killer, if it finds that the defendant aided and abetted a felony enumerated in section 190.2, subdivision (a)(17) "with reckless indifference to human life and as a major participant." (*People v. Montes* (2014) 58 Cal.4th 809, 897 [kidnapping]; *People v. Mil* (2012) 53 Cal.4th 400, 409 [burglary].) "Reckless indifference to human life" means "a defendant's subjective awareness of the grave risk to human life created by his or her participation in the underlying felony." (*People v. Estrada* (1995) 11 Cal.4th 568, 578.)

Baeza states that he did not act with reckless indifference to human life by participating in the burglary of Alvarez's home and Alvarez's kidnapping because he had military combat experience; he had participated in similar "missions" overseas; he viewed the "mission" to obtain information about Villasenor's whereabouts as "just another 'mission'"; and, given his background and experience, he "would consider getting into a van with other armed men to be no different than what he experienced by participating in Army missions." He contends that because the goals of the burglary and Alvarez's kidnapping were to obtain information about Villasenor's whereabouts and to keep Alvarez alive, he had no reason to believe that Alvarez would be harmed.

There is sufficient evidence from which the jury could have found that Baeza aided and abetted the burglary and kidnapping with reckless indifference to human life—i.e., with the subjective awareness of the grave risk to human life his participation in the burglary and kidnapping created. (§ 190.2, subd. (d); *People v. Montes, supra,* 58 Cal.4th at p. 897; *People v. Mil, supra,* 53 Cal.4th at p. 409; *People v. Estrada, supra,* 11 Cal.4th

---

"Notwithstanding subdivision (c) [aiding and abetting a first degree murder with the intent to kill], every person, not the actual killer, who, with reckless indifference to human life and as a major participant, aids, abets, counsels, commands, induces, solicits, requests, or assists in the commission of a felony enumerated in paragraph (17) of subdivision (a) which results in the death of some person or persons, and who is found guilty of murder in the first degree therefor, shall be punished by death or imprisonment in the state prison for life without the possibility of parole if a special circumstance enumerated in paragraph (17) of subdivision (a) has been found to be true under Section 190.4." Kidnapping and burglary are enumerated offenses in paragraph (17) of subdivision (a). (§ 190.2, subd. (a)(17)(B) & (G).)

18

at p. 578.) Notwithstanding Baeza's military service and claimed prior experience in similar "missions," at the urging of a 38th Street gang member, Baeza participated in the home invasion kidnapping of a gang member he believed to be "very violent." The organizer of the home invasion kidnapping provided Baeza with a flak jacket, suggesting that he believed that Baeza was in danger of being shot during the "mission." Baeza entered Alvarez's house armed with an M-16 rifle and participated in a home invasion kidnapping with four armed would-be criminals rounded up by a gang member. One of his companions used two shotgun blasts to gain entry into the Alvarez home. In addition to Alvarez, Alvarez's wife, children, and parents were in the home at the time of the invasion. The suggestion that such a dangerous and ill-conceived plot bears any resemblance to a mission carried out by members of the United States Army is not entitled to serious consideration.

## III.  Section 654's Application to the Burglary, Kidnapping, and Being a Felon in Possession of a Firearm Convictions

Baeza and Benavidez were convicted in count 1 of murder with the special circumstance that they committed the murder while they were engaged in the commission of a burglary or a kidnapping. Baeza and Benavidez were convicted in count 2 of kidnapping, in count 3 of first degree burglary, and in counts 5 (Benavidez) and 6 (Baez) of being a felon in possession of a firearm. The trial court sentenced Baeza and Benavidez to terms of life without the possibility of parole plus 25 years to life on count 1 (murder), consecutive terms of 30 years to life on count 2 (kidnapping), concurrent terms of nine years on count 3 (first degree burglary), and concurrent terms of five years on counts 5 (Benavidez) and 6 (Baeza) (being a felon in possession of a firearm). Baeza contends that the trial court should have stayed imposition of sentence on counts 2 (kidnapping), 3 (burglary), and 6 (being a felon in possession of a firearm) pursuant to section 654 because the offenses were part of an indivisible course of conduct. Benavidez contends that the trial court should have stayed his sentence on count 2

19

(kidnapping) under section 654.[9]  Respondent agrees that the sentences for burglary and kidnapping should have been stayed under section 654, but argues that the sentences for being a felon in possession of a firearm properly were imposed.  We hold that Baeza's and Benavidez's sentences for their burglary and kidnapping convictions and Benavidez's sentence for being a felon in possession of a firearm conviction should have been stayed under section 654.  We further hold that Baeza's sentence for his being a felon in possession of a firearm conviction properly was not stayed under section 654.

### A.	Section 654[10]

"It is well settled that section 654 protects against multiple punishment, not multiple conviction.  (*People v.  McFarland* (1962) 58 Cal.2d 748, 762 [26 Cal.Rptr. 473, 376 P.2d 449].)  The statute itself literally applies only where such punishment arises out of multiple statutory violations produced by the 'same act or omission.'  (See, e.g., *People v. Siko* (1988) 45 Cal.3d 820, 823-826 [248 Cal.Rptr. 110, 755 P.2d 294].)  However, because the statute is intended to ensure that [a] defendant is punished 'commensurate with his culpability' ([*People v.*] *Perez* [(1979)] 23 Cal.3d [545], 551), its

---

**9**	Although he claims in his reply brief that he previously joined all of Baeza's section 654 arguments, Benavidez only expressly joined Baeza's section 654 argument as to his kidnapping conviction.  Nevertheless, we will also consider whether Benavidez's sentences for his burglary and being a felon in possession of a firearm convictions should have been stayed under section 654.  (*People v. Perez* (1979) 23 Cal.3d 545, 550, fn. 3 ["Errors in the applicability of section 654 are corrected on appeal regardless of whether the point was raised by objection in the trial court or assigned as error on appeal.  (See e.g., *People v. Miller* (1977) 18 Cal.3d 873, 887 [135 Cal.Rptr. 654, 558 P.2d 552]; *People v. Milan* (1973) 9 Cal.3d 185, 189 [107 Cal.Rptr. 68, 507 P.2d 956]; *People v. Isenor* (1971) 17 Cal.App.3d 324, 335-336 [94 Cal.Rptr. 746])"].)

**10**	Section 654, subdivision (a) provides:
	"An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision.  An acquittal or conviction and sentence under any one bars a prosecution for the same act or omission under any other."

protection has been extended to cases in which there are several offenses committed during 'a course of conduct deemed to be indivisible in time.'  (*People v. Beamon* (1973) 8 Cal.3d 625, 639 [105 Cal.Rptr. 681, 504 P.2d 905].)"  (*People v. Harrison* (1989) 48 Cal.3d 321, 335.)

### B.      The Burglary and Kidnapping Convictions

When a defendant is prosecuted solely under a felony-murder theory, he may not be sentenced consecutively for the murder and underlying felony.  (*People v. Boyd* (1990) 222 Cal.App.3d 541, 575-576; *People v. Mulqueen* (1970) 9 Cal.App.3d 532, 547; *People v. Magee* (1963) 217 Cal.App.2d 443, 470-472.)  Section 654 bars imposition of punishment for the underlying felony because the underlying felony was the act that made the homicide first degree murder.  (*People v. Boyd, supra,* 222 Cal.App.3d at p. 575; *People v. Mulqueen, supra,* 9 Cal.App.3d at p. 547.)

The prosecution prosecuted Baeza and Benavidez solely on a felony-murder theory.  The trial court instructed the juries only on felony murder, with burglary "or" kidnapping being the underlying felonies.  Accordingly, because burglary and kidnapping were the act or acts that made Alvarez's homicide first degree murder, section 654 barred imposition of sentence on those underlying felonies.  (*People v. Boyd, supra,* 222 Cal.App.3d at pp. 575-576; *People v. Mulqueen, supra,* 9 Cal.App.3d at p. 547; *People v. Magee, supra,* 217 Cal.App.2d at pp. 470-472.)  Baeza's and Benavidez's abstracts of judgment are ordered modified to reflect stays of their burglary and kidnapping sentences under section 654.

### C.      The Felon in Possession of a Firearm Convictions

"'Whether a violation of section 12021, forbidding persons convicted of felonies from possessing firearms concealable upon the person, constitutes a divisible transaction from the offense in which he employs the weapon depends upon the facts and evidence of each individual case.  Thus where the evidence shows a possession distinctly antecedent and separate from the primary offense, punishment on both crimes has been approved.

On the other hand, where the evidence shows a possession only in conjunction with the primary offense, then punishment for the illegal possession of the firearm has been held to be improper where it is the lesser offense.' [Citation.]" (*People v. Bradford* (1976) 17 Cal.3d 8, 22.)

Baeza testified that he brought the M-16 with him to the "mission." Accordingly, his possession of that firearm was distinctly antecedent to the burglary, kidnapping, or murder and section 654 did not prevent separate punishment for his conviction for being a felon in possession of a firearm. (*People v. Bradford, supra,* 17 Cal.3d at p. 22; *People v. Jones* (2002) 103 Cal.App.4th 1139, 1145 ["section 654 is inapplicable when the evidence shows that the defendant arrived at the scene of his or her primary crime already in possession of the firearm"].)

Because Baeza's aggregate sentence is reduced by a term of 30 years to life by our holding that section 654 applied to Baeza's kidnapping conviction, we remand the matter to the trial court for resentencing on Baeza's being a felon in possession of a firearm conviction. (See *People v. Neely* (2009) 176 Cal.App.4th 787, 799.) In its discretion, the trial court is to determine the appropriate term for Baeza's being a felon in possession of a firearm conviction. (*Ibid.*)

The only evidence concerning the timing of Benavidez's possession of a firearm was his statement to Detective Holston and Sergeant Rubino that "they"—those involved in the burglary and Alvarez's kidnapping—gave him a handgun, apparently when he entered the van. That evidence showed possession "only in conjunction with the primary offense[s]," and not "possession distinctly antecedent and separate from the primary offense[s]." (*People v. Bradford, supra,* 17 Cal.3d at p. 22.) Accordingly, imposition of sentence for Benavidez's being a felon in possession of a firearm conviction should have been stayed under section 654. Benavidez's abstract of judgment is order modified to reflect a stayed sentence for that conviction under section 654.

**IV. The Parole Revocation Restitution Fines (§ 1202.45)**

Baeza contends that the $1,000 parole revocation restitution fine (§ 1202.45[11]) must be stricken from his sentencing minute order and abstract of judgment because the trial court did not impose such a fine at the sentencing hearing. He further contends that a parole revocation restitution fine could not properly have been imposed in his case because he received a sentence of life without the possibility of parole for his murder conviction and thus was ineligible for parole. Benavidez contends that the trial court improperly imposed a $1,000 parole revocation restitution fine because he received a sentence of life without the possibility of parole for his murder conviction and thus was ineligible for parole.

At Baeza's sentencing hearing, the trial court imposed a $1,000 restitution fine pursuant to section 1202.4, subdivision (b). It did not, however, impose a parole revocation restitution fine pursuant to section 1202.45. Nevertheless, the minute order for Baeza's sentencing hearing and his abstract of judgment reflect that the trial court imposed a $1,000 parole revocation restitution fine.

Baeza cites *People v. Zackery* (2007) 147 Cal.App.4th 380, 385 for the well-established proposition that "[w]here there is a discrepancy between the oral pronouncement of judgment and the minute order or the abstract of judgment, the oral pronouncement controls." In determining whether we should strike the parole revocation restitution fine from the minute order and abstract of judgment, the issue is not whether the trial court actually imposed a parole revocation restitution fine—it clearly did not. Rather, the issue is whether the trial court's failure to impose a mandatory parole revocation restitution fine may be corrected on appeal—it may be corrected. "[W]here the trial court imposes a section 1202.4 fine, its omission of a concomitant, mandatory

---

[11]    Section 1202.45, subdivision (a) provides:
    "In every case where a person is convicted of a crime and his or her sentence includes a period of parole, the court shall, at the time of imposing the restitution fine pursuant to subdivision (b) of Section 1202.4, assess an additional parole revocation restitution fine in the same amount as that imposed pursuant to subdivision (b) of Section 1202.4."

parole revocation fine under section 1202.45 in the same amount results in an unauthorized sentence which may be corrected in the first instance on appeal." (*People v. Rodriguez* (2000) 80 Cal.App.4th 372, 378; § 1202.45.)  Accordingly, Baeza's claim that we must strike the $1,000 parole revocation restitution fine from his sentencing minute order and abstract of judgment fails.

Baeza and Benavidez rely on our opinion in *People v. Oganesyan* (1999) 70 Cal.App.4th 1178, 1183 (*Oganesyan*) for the proposition that the trial court could not properly impose parole revocation restitution fines because they received sentences of life without the possibility of parole for their murder convictions and thus were ineligible for parole.  Instead, the California Supreme Court's decision in *People v. Brasure* (2008) 42 Cal.4th 1037, 1075 (*Brasure*) controls.  In *Brasure*, the court held that a parole revocation restitution fine under section 1202.45 is mandatory in every case in which there is at least one count with a determinate sentence, even when the defendant is sentenced to death on other counts.  (*Brasure, supra,* 42 Cal.4th at p. 1075.)  The Supreme Court distinguished our opinion in *Oganesyan* on the ground that that case did not involve a "determinate term of imprisonment imposed under section 1170, but rather a sentence of life without the possibility of parole for first degree special-circumstance murder and an indeterminate life sentence for second degree murder.  (*Oganesyan*, at p. 1181.)" (*Brasure, supra,* 42 Cal.4th at p. 1075.)  The court stated, "As in *Oganesyan*, to be sure, defendant here is unlikely ever to serve any part of the parole period on his determinate sentence.  Nonetheless, such a period was included in his determinate sentence by law and carried with it, also by law, a suspended parole revocation restitution fine.  Defendant is in no way prejudiced by assessment of the fine, which will become payable only if he actually does begin serving a period of parole and his parole is revoked." (*Ibid.*)  Although a parole revocation restitution fine must be imposed in cases in which there is one count with a determinate sentence (*Brasure, supra,* 42 Cal.4th at p. 1075), such a fine may not be imposed when the determinate sentence has been stayed under section 654.  (*People v. Pearson* (1986) 42 Cal.3d 351, 361 ["section 654 prohibits the use of a conviction for any punitive purpose if the sentence on that conviction is

stayed"]; *People v. Cruz* (2012) 207 Cal.App.4th 664, 672-673, fn. 8 [at least for ex post facto purposes, "imposition of a parole revocation restitution fine pursuant to section 1202.45 is viewed as punitive"]; see *People v. Hannah* (1999) 73 Cal.App.4th 270, 274-275 [a trial court may not impose a section 1202.45 fine if it suspended the state prison sentence and placed the defendant on probation because the defendant was "presently not subject to a parole period and will not be absent a revocation of her probation and commitment to prison"]; see also *People v. Hanson* (2000) 23 Cal.4th 355, 361-362 [the restitution fine under section 1202.4, subdivision (b) is a criminal penalty or punishment]; *People v. Le* (2006) 136 Cal.App.4th 925, 933 [section 654's ban on multiple punishments is violated if the trial court considers a sentence that should have been stayed pursuant to section 654 in calculating the restitution fine under the formula provided by section 1202.4, subdivision (b)(2)].)

Here, in addition to their sentences of life without the possibility of parole for Alvarez's murder, Baeza and Benavidez also were sentenced to determinate terms for their burglary, kidnapping, and being a felon in possession of a firearm convictions. We held above that the sentences for Baeza's determinate term offenses of burglary and kidnapping should have been stayed under section 654, but that the sentence for his determinate term offense of being a felon in possession of a firearm was not subject to section 654's terms. Accordingly, because Baeza is to serve a concurrent determinate term and thus is subject to a period of parole, the section 1202.45 was mandatory. (*Brasure, supra,* 42 Cal.4th at p. 1075; *People v. Pearson, supra,* 42 Cal.3d at p. 361; *People v. Hanson, supra,* 23 Cal.4th at pp. 361-362; *People v. Cruz, supra,* 207 Cal.App.4th at pp. 672-673, fn. 8; see *People v. Hannah, supra,* 73 Cal.App.4th at pp. 274-275.) We also held above that all of Benavidez's determinate term offenses should have been stayed under section 654. Accordingly, because Benavidez is not to serve a determinate term and thus is not subject to a period of parole, the trial court erred in imposing on him a parole revocation restitution fine under section 1202.45. (*Brasure, supra,* 42 Cal.4th at p. 1075; *People v. Pearson, supra,* 42 Cal.3d at p. 361; *People v. Hanson, supra,* 23 Cal.4th at pp. 361-362; *People v. Cruz, supra,* 207 Cal.App.4th at pp.

672-673, fn. 8; see *People v. Hannah, supra,* 73 Cal.App.4th at pp. 274-275.) Benavidez's abstract of judgment is order modified to strike the parole revocation restitution fine.

**V.     CALJIC No. 3.00**

Benavidez contends that his jury's finding on the felony murder special circumstance allegation must be reversed because the trial court erred in instructing his jury with CALJIC No. 3.00 that "[e]ach principal, regardless of the extent or manner of participation is equally guilty."  Benavidez forfeited any objection to CALJIC No. 3.00 by failing to object or to request appropriate clarifying or amplifying language in the trial court.  In any event, any error with respect to CALJIC No. 3.00 was harmless.

*A.     Forfeiture*

Benavidez contends that we should review his contention with respect to CALJIC No. 3.00 even though he made no objection to the instruction in the trial court because the trial court had a duty to instruct the jury correctly and the instruction affected his substantial rights within the meaning of section 1259.[12]  Benavidez further contends that if he was obligated to object in the trial court, defense counsel was ineffective in failing to do so.

The trial court instructed Benavidez's jury with CALJIC No. 3.00 that, "Persons who are involved in commiting [*sic*] a crime are referred to as principals in that crime. Each principal, regardless of the extent or manner of participation is equally guilty.

---

[12]     Section 1259 provides:

"Upon an appeal taken by the defendant, the appellate court may, without exception having been taken in the trial court, review any question of law involved in any ruling, order, instruction, or thing whatsoever said or done at the trial or prior to or after judgment, which thing was said or done after objection made in and considered by the lower court, and which affected the substantial rights of the defendant.  The appellate court may also review any instruction given, refused or modified, even though no objection was made thereto in the lower court, if the substantial rights of the defendant were affected thereby."

26

Principals include: [¶] 1. Those who directly and actively commit the act constituting the crime, or 2. Those who aid and abet the commission of the crime."

In *People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1163, the court considered whether a challenge to CALCRIM No. 400—the CALCRIM analogue to CALJIC No. 3.00—had been forfeited by the defendant's failure to object to the instruction in the trial court. The court stated, "Generally, '"[a] party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language."' [Citations.]" (*People v. Samaniego, supra,* 172 Cal.App.4th at p. 1163.) The court stated that because CALCRIM No. 400 was generally an accurate statement of law, though misleading in that case, the defendant was obligated to request modification or clarification and, having failed to do so, forfeited his challenge to the instruction. (*Ibid.*; *People v. Mejia* (2012) 211 Cal.App.4th 586, 624.) Here, Benavidez failed to object to CALJIC No. 3.00 or to request appropriate clarifying or amplifying language. We do not believe "substantial rights of the defendant" were affected by a forfeiture. (§ 1259.) Accordingly, Benavidez has forfeited appellate review of his claim. (See *People v. Mejia, supra,* 211 Cal.App.4th at p. 624; *People v. Samaniego, supra,* 172 Cal.App.4th at p. 1163.)

Benavidez contends that if his attorney's failure to object to CALJIC No. 3.00 in the trial court forfeited appellate review of his claim, then he received ineffective assistance of counsel. "'Generally, a conviction will not be reversed based on a claim of ineffective assistance of counsel unless the defendant establishes *both* of the following: (1) that counsel's representation fell below an objective standard of reasonableness; *and* (2) that there is a reasonable probability that, but for counsel's unprofessional errors, a determination more favorable to defendant would have resulted. [Citations.]'" (*People v. Foster* (2003) 111 Cal.App.4th 379, 383.) "Generally, . . . prejudice must be affirmatively proved. [Citations.] 'It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding . . . . The defendant must show that there is a reasonable probability that, but for counsel's unprofessional

27

errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome.'  [Citations.]" (*People v. Ledesma* (1987) 43 Cal.3d 171, 217-218.)  If the defendant fails to make a sufficient showing either of deficient performance or prejudice, the ineffective assistance claim fails.  (*People v. Foster, supra,* 111 Cal.App.4th at p. 383.)

Any deficiency in defense counsel's failure to object to CALJIC No. 3.00 or to request that the instruction be modified was not prejudicial.  (*In re Fields* (1990) 51 Cal.3d 1063, 1079 [a reviewing court need not determine "'whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies . . . .  If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed'"] quoting *Strickland v. Washington* (1984) 466 U.S. 668, 697; *People v. Boyette* (2002) 29 Cal.4th 381, 430-431 ["We reject defendant's contention that his counsel were ineffective for failing to object, because even assuming counsel's inaction was unreasonable, no prejudice resulted"].)  Because, as we explain below, any error in instructing with CALJIC No. 3.00 was harmless, Benavidez was not prejudiced by the failure to object to CALJIC No. 3.00, and thus did not receive reversible ineffective assistance of counsel.  (*In re Fields, supra,* 51 Cal.3d at p. 1079; *People v. Boyette, supra,* 29 Cal.4th at pp. 430-431.)

## B.  Harmless Error

CALJIC No. 3.00 may have the potential to mislead the jury.  In considering a challenge to CALCRIM No. 400, the court in *People v. Samaniego, supra,* 172 Cal.App.4th at pages 1164-1165 stated, "The Supreme Court reasoned that 'when a person, with the mental state necessary for an aider and abettor, helps or induces another to kill, that person's guilt is determined by the combined acts of all the participants as well as that person's own *mens rea.*  If that person's *mens rea* is more culpable than another's, that person's guilt may be greater even if the other might be deemed the actual perpetrator.'  ([*People v.*] *McCoy* [(2001)] 25 Cal.4th [1111,] 1117, 1122, italics added.)

28

"'[O]nce it is proved that 'the principal has caused an *actus reus,* the liability of each of the secondary parties should be assessed according to his own *mens rea.*'"" (*Id.* at p. 1118.) When the offense is a specific intent offense, "'the accomplice must 'share the specific intent of the perpetrator'; this occurs when the accomplice 'knows the full extent of the perpetrator's criminal purpose and gives aid or encouragement with the intent or purpose of facilitating the perpetrator's commission of the crime.'"" (*Ibid.*) In the case of murder, the aider and abettor 'must know and share the murderous intent of the actual perpetrator.' (*Ibid.*) [¶] Though *McCoy* concluded that an aider and abettor could be guilty of a greater offense than the direct perpetrator, its reasoning leads inexorably to the further conclusion that an aider and abettor's guilt may also be less than the perpetrator's, if the aider and abettor has a less culpable mental state. (See *People v. Woods* (1992) 8 Cal.App.4th 1570, 1577 [11 Cal.Rptr.2d 231].) Consequently, CALCRIM No. 400's direction that '[a] person is *equally guilty* of the crime [of which the perpetrator is guilty] whether he or she committed it personally or aided and abetted the perpetrator who committed it' (CALCRIM No. 400, italics added), while generally correct in all but the most exceptional circumstances, is misleading here and should have been modified."

Even if the trial court erred in instructing the jury with CALJIC No. 3.00, any such error was harmless. We review instructional error with respect to CALJIC No. 3.00 using the harmless error test under *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*). (See *People v. Mejia, supra,* 211 Cal.App.4th at p. 625; *People v. Samaniego, supra,* 172 Cal.App.4th at p. 1165.) Under that test, we find the error harmless if we determine beyond a reasonable doubt that the jury verdict would have been the same absent the error. (*People v. Mejia, supra,* 211 Cal.App.4th at p. 625; *People v. Samaniego, supra,* 172 Cal.App.4th at p. 1165.) CALJIC Nos. 3.01 and 8.80.1 that were given to Benavidez's jury required the jury to find an individual intent to kill and thereby would have vitiated in large part any possible confusion by CALJIC No. 3.00. (See *People v. Mejia, supra,* 211 Cal.App.4th at p. 634.)

Moreover, the evidence adduced at trial in support of the burglary or kidnapping special circumstance—that Benavidez aided and abetted the shooter in Alvarez's murder

with the intent to kill or that he acted with reckless indifference to human life by participating in the burglary or the kidnapping—was substantial. The evidence showed that Benavidez, at the urging of a 38th Street Gang member, participated with others in an armed, home invasion kidnapping. One of his companions used two shotgun blasts to gain entry into the Alvarez home. The Alvarez home was occupied at the time of the invasion—Alvarez and his wife, children, and parents were in the home. Moreover, even if Benavidez's jury believed Benavidez's statement in his interview with Detective Holston and Sergeant Rubino that he entered Alvarez's home with the intent to rob Alvarez rather than to kidnap him, his admission that he entered Alvarez's house with the intent to rob was sufficient to support the special circumstance based on burglary. (See *People v. Abilez* (2007) 41 Cal.4th 472, 508.) Thus, the evidence showed that under the circumstances, Benavidez acted with reckless indifference to human life. Accordingly, even if the trial court had not instructed the jury with CALJIC No. 3.00, or had instructed with a modified version, it is beyond a reasonable doubt that the jury would have found true the burglary or kidnapping special circumstance. (See *People v. Mejia, supra,* 211 Cal.App.4th at p. 625; *People v. Samaniego, supra,* 172 Cal.App.4th at p. 1165.)

## VI.     Benavidez's Interview Transcript

Benavidez contends that the failure to redact references to his parole status and prior incarceration from the transcript the jury viewed of his interview with Detective Holston and Sergeant Rubino violated Evidence Code section 352.[13] He contends that the error was prejudicial because it compromised the jury's ability to fairly and dispassionately resolve his status as an aider and abettor for the special circumstance

---

[13]     He also contends that it is reasonable to assume that the unredacted transcript accurately portrayed the recording played for the jury—i.e., that the recording also contained the objectionable material. Because the parties stipulated that the court reporter did not need to transcribe the recording played for the jury, we cannot determine whether Benavidez's assumption is correct. Whether the complained of statements were presented to the jury through the recording or the transcript or both appears to be immaterial. For purposes of our analysis, we will assume that the recording played for the jury also contained the statements about which Benavidez complains.

allegation—i.e., whether he aided and abetted the shooter in Alvarez's murder with the intent to kill or aided and abetted the burglary or kidnapping "with reckless indifference to human life and as a major participant." He further contends that "[t]o the extent that trial counsel's failed [*sic*] to properly review the transcript here at issue before it went to the jury or to pay attention to the recording actually being played in open court . . . counsel rendered prejudicial ineffective assistance."

### A.    Background

During trial, Benavidez asked that certain references to his parole status and prior incarceration in his interview with Detective Holston and Sergeant Rubino not be presented to the jury and thus be redacted. The prosecutor agreed not to play for the jury the recording of that part of the interview to which Benavidez objected, and to redact the objectionable material from the transcript of the interview to be provided to the jury.[14] The transcript that was provided to the jury contained a discussion about the identity of Benavidez's parole agent. It also contained Benavidez's statement that he had been in "Chino" with Grumps before Grumps was paroled—the inference being that "Chino" was a prison because it was a place from which Grumps was paroled.[15]

---

[14]    Benavidez claims that the trial court ruled that the probative value of the evidence was outweighed by its potential for prejudice, and ordered the interview transcript redacted. The trial court made no such finding or order, it merely presided over the parties' resolution of the issue.

[15]    In the discussion of Benavidez's objection, his attorney appears to have quoted language from the interview transcript about Benavidez's parole status and prior incarceration that does not appear in the transcript presented to the jury. It is unclear whether defense counsel misquoted the transcript or whether the prosecutor prepared a new version of the transcript that removed some, but not all, references to Benavidez's parole status and prior incarceration. On appeal, Benavidez's claim is limited to his statements about his parole agent's identity and having been in Chino with Grumps.

31

### B.    Forfeiture

Citing *People v. Marks* (2003) 31 Cal.4th 197, 228, respondent contends that Benavidez has forfeited review of this issue because he did not object in the trial court to the specific references to his parole status and prior incarceration that he complains of on appeal.  Forfeiture is not appropriate because Benavidez's objection, reasonably construed, concerned the evidence that is the subject of his appellate claim.  In explaining his objection, Benavidez told the trial court, "there are two *areas* that I'm concerned about."  (Italics added.)  The first area was Benavidez's parole status—"as reflected on page 5 of the document, it talks about him being on parole."  The second area was his prior incarceration—"he described meeting a person [Grumpy] who had initially informed him of this incident, and he said he knew this person from being in, he said, 'Chino,' which means that he was in state prison with this person."  In further discussing his objection and identifying transcript statements related to those "areas" to which he objected, Benavidez's attorney did not quote or specifically identify, by page and line, the transcript statements he complains about on appeal.  Nevertheless, reasonably construed, Benavidez's objection included those statements.  (See *People v. Partida* (2005) 37 Cal.4th 428, 434-435 ["[T]he requirement of a specific objection serves important purposes.  But, to further these purposes, the requirement must be interpreted reasonably, not formalistically"].)  Accordingly, Benavidez has not forfeited review of this issue.

### C.    Application of Relevant Principles

Evidence Code section 352 provides, "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."  We review a claim that a trial court erred in admitting evidence under Evidence Code section 352 under *People v. Watson* (1956) 46 Cal.2d 818, 836—i.e., an error is harmless unless it is "'reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error.'"  (*People v. Earp* (1999) 20 Cal.4th 826, 878.)

32

Even if it was error for Benavidez's jury to receive the unredacted interview transcript and to learn of Benavidez's parole status and prior incarceration, any such error was harmless. In light of the evidence discussed above in connection with Benavidez's CALJIC No. 3.00 argument in support of the burglary or kidnapping special circumstance, it is not reasonably probable that the jury would have found the special circumstance allegation not true if it had not learned that Benavidez was on parole and had been incarcerated. Moreover, because any error with respect to the unredacted interview transcript was harmless, Benavidez was not prejudiced by counsel's failure "to properly review the transcript . . . before it went to the jury or to pay attention to the recording actually being played in open court" and thus did not receive ineffective assistance of counsel. (*In re Fields, supra,* 51 Cal.3d at p. 1079; *People v. Boyette, supra,* 29 Cal.4th at pp. 430-431.)

## VII.    Sufficiency of the Evidence Supporting Benavidez's Gang Enhancements

Benavidez claims that there is insufficient evidence to support his gang enhancements. Sufficient evidence supports the gang enhancements.

### A.    *Standard of Review*

We review a claim of insufficient evidence to support a gang enhancement finding under the same standard of review that we use for a claim of insufficient evidence to support a conviction on a substantive offense. (*People v. Villalobos* (2006) 145 Cal.App.4th 310, 321-322.) We set forth that standard of review above. Under that standard, "[a] reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support"' the jury's verdict. [Citation.]" (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.)

### B.    *Application of Relevant Principles*

"[T]o prove the elements of the criminal street gang enhancement, the prosecution may, as in this case, present expert testimony on criminal street gangs. (*People v.*

33

*Gardeley* [(1996)] 14 Cal.4th [605,] 617-620.)" (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1047-1048.) "'Expert opinion that particular criminal conduct benefited a gang' is not only permissible but can be sufficient to support the Penal Code section 186.22, subdivision (b)(1), gang enhancement." (*People v. Vang* (2011) 52 Cal.4th 1038, 1048; see *People v. Albillar* (2010) 51 Cal.4th 47, 63 ["Expert opinion that particular criminal conduct benefited a gang by enhancing its reputation for viciousness can be sufficient to raise the inference that the conduct was 'committed for the benefit of . . . a[ ] criminal street gang' within the meaning of section 186.22(b)(1). [Citation.]"]; *People v. Gardeley, supra,* 14 Cal.4th at p. 619.)

Officer Rodriguez, the prosecution's gang expert in the case against Benavidez, opined that Benavidez was a member of the 213 gang. He further opined, based on a set of hypothetical facts modeled on the facts in this case, that the burglary, kidnapping, and shooting described in the hypothetical facts benefited the 213 gang. He explained that such crimes intimidate and instill fear in the community, causing the community to be less likely to cooperate with the police when the gang commits a crime, thus allowing the gang to commit crimes openly. Officer Rodriguez's testimony is sufficient to support the gang enhancements. (*People v. Zamudio, supra,* 43 Cal.4th at p. 357; *People v. Villalobos, supra,* 145 Cal.App.4th at pp. 321-322; *People v. Vang, supra,* 52 Cal.4th at p. 1048; *People v. Hernandez, supra,* 33 Cal.4th at pp. 1047-1048; *People v. Gardeley, supra,* 14 Cal.4th at p. 619.)

## VIII.  Multiple Conviction Rule and Double Jeopardy Principles

Benavidez argues that the imposition of the 25 years to life enhancement under section 12022.53, subdivision (d) on his murder conviction violates California's "multiple conviction rule" as stated in *People v. Ortega* (1998) 19 Cal.4th 686 and *People v. Pearson, supra,* 42 Cal.3d 351. This is so, Benavidez contends, because the factual element essential to establishing the section 12022.53, subdivision (d) enhancement—discharge of a firearm causing death—is necessarily subsumed within the elements of murder—proximately causing the death of the victim. Benavidez also argues

that federal double jeopardy principles should apply to multiple punishments within a unitary trial and not to successive prosecutions only.

Benavidez concedes that two California Supreme Court decisions have rejected his contention under California's multiple conviction rule. (*People v. Sloan* (2007) 42 Cal.4th 110, 115-125 and *People v. Izaguirre* (2007) 42 Cal.4th 126, 130-134.) Benavidez's argument that his punishment violated California's multiple conviction rule fails because we are bound by those decisions under *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.

Benavidez also concedes that, historically, federal double jeopardy has not applied to multiple punishments within a unitary trial, but contends that recent United States Supreme Court decisions "suggest" that it now should. Again, because there is California Supreme Court and United States Supreme Court authority holding that multiple criminal punishments that arise out of a unitary criminal proceeding do not implicate federal double jeopardy principles (*People v. Sloan, supra,* 42 Cal.4th at p. 121; *Hudson v. United States* (1997) 522 U.S. 93, 99), we are bound to follow that authority and reject Benavidez's double jeopardy contention.

## IX. Benavidez's Section 667.5, Subdivision (b) Prior Conviction Allegations

Respondent argues that the trial court "neglected" to impose on Benavidez a mandatory consecutive 12 year term under section 667.5, subdivisions (a) and (c) for Benavidez's admitted four prior convictions. Citing *People v. Thomas* (2013) 214 Cal.App.4th 636, 640, respondent argues that the trial court's error was jurisdictional and that that we may correct the error. Respondent contends that we should correct Benavidez's sentence or instruct the trial court to do so on remand. We asked the parties to submit supplemental letter briefs addressing whether the trial court properly advised Benavidez of the penal consequences under section 667.5, subdivision (b)[16] of his

---

**16**     See footnote 4 above. In its supplemental letter brief, respondent corrects its mistake in requesting imposition of a 12 year term under subdivision (a) rather than a four year term under subdivision (b) of section 667.5.

admission that he suffered four prior convictions and, if the trial court failed properly to advise him, whether we should remand Benavidez's case to the trial court for retrial of the prior conviction allegations.

"Before a trial court may accept a defendant's admission of prior felony convictions, the court must advise the accused of the right against compulsory self-incrimination, the right to confrontation, and the right to a jury trial. (*People v. Mosby* (2004) 33 Cal.4th 353, 359-360 [15 Cal.Rptr.3d 262, 92 P.3d 841] . . . ; *Boykin v. Alabama* (1969) 395 U.S. 238, 243 [23 L.Ed.2d 274, 89 S.Ct. 1709]; *In re Tahl* (1969) 1 Cal.3d 122, 132 [81 Cal.Rptr. 577, 460 P.2d 449]; *In re Yurko* (1974) 10 Cal.3d 857 [112 Cal.Rptr. 513, 519 P.2d 561].) The trial court also must advise the accused of the penal consequences of admitting a prior conviction." (*People v. Sifuentes* (2011) 195 Cal.App.4th 1410, 1420.) "'Unlike an uninformed waiver of the specified constitutional rights which renders a plea or admission involuntary and requires that it be set aside, an uninformed waiver based on the failure of the court to advise an accused of the consequences of an admission constitutes error which requires that the admission be set aside only if the error is prejudicial to the accused.' [Citation.] 'A showing of prejudice requires the appellant to demonstrate that it is reasonably probable he would not have entered his plea if he had been told about the [penal consequences].' [Citations.]" (*People v. Walker* (1991) 54 Cal.3d 1013, 1022-1023, overruled on another ground in *People v. Villalobos, supra,* 54 Cal.4th at p. 183.) On remand, the prior conviction allegations may be retried. (*People v. Sifuentes, supra,* 195 Cal.App.4th at p. 1421.)

Here, the trial court failed to advise Benavidez of the penal consequences of his admissions. Accordingly, we remand the matter to the trial court to determine whether Benavidez suffered prejudice. If the trial court finds prejudice, then the prosecution may retry the allegations that Benavidez suffered four prior convictions for which he served a term in prison within the meaning of section 667.5, subdivision (b). If the trial court does not find prejudice, then it must strike or impose the sentence enhancements under section 667.5, subdivision (b).

## DISPOSITION

Baeza's abstract of judgment is ordered modified to reflect a stay of imposition of sentence on his burglary and kidnapping convictions under section 654, and his case is remanded to the trial court for resentencing on his being a felon in possession of a firearm conviction. Benavidez's abstract of judgment is ordered modified to reflect a stay of imposition of sentence on his burglary, kidnapping, and being a felon in possession of a firearm under section 654 and to strike the $1,000 section 1202.45 parole revocation restitution fine. Benavidez's case is remanded to the trial court for further proceedings, as set forth above, in connection with the allegations that Benavidez suffered four prior convictions within the meaning of section 667.5, subdivision (b). The judgments are otherwise affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.



MOSK, J.


We concur:



TURNER, P. J.



MINK, J.*

---

\*      Retired Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

37